Timothy C. PIGFORD, et al., Appellees,

Leonard C. Cooper, Appellant,

v.

Dan GLICKMAN, Secretary, The United States Department of Agriculture, Appellee.

Nos. 99–5222, 99–5223.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 2000.

Decided March 31, 2000.

David M. Schnorrenberg argued the cause for appellant. With him on the briefs were Richard T. Seymour, Teresa A. Ferrante, Stephon J. Bowens, Marcus Jimison, J. Michael Klise and Matthew C. Hans. Julie Nepveu and Julie L. Gantz entered appearances.

Alexander J. Pires, Jr. argued the cause for appellees Freddie Jones, et al. With him on the brief was Phillip L. Fraas.

Robert M. Loeb, Attorney, U.S. Department of Justice, argued the cause for appellee Dan Glickman, Secretary, The United States Department of Agriculture. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Marleigh Dover, Special Counsel, and Wilma A. Lewis, U.S. Attorney.

Before: SENTELLE, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Leonard C. Cooper appeals the district court's order approving a consent decree settling lawsuits brought by a class of approximately 20,000 African–American farmers, of which Mr. Cooper is a member, against the United States Department of Agriculture ("USDA").[1] *See Pigford v.*

---

1. Mr. Cooper is the only member of the class to appeal although in noting his appeal he purported to file on behalf of himself individ-

ually and as a representative of a class of African–American farmers, sending copies to nine named persons. None of those persons

*Glickman,* 185 F.R.D. 82 (D.D.C.1999). Under the decree, the United States is likely to provide an estimated $2 billion in debt relief and monetary payments in consideration for the dismissal of the class' complaint alleging that USDA systematically discriminated against them on the basis of their race. *See id.* at 111. Making no claim that the farmers' individual claims cannot be fairly and justly resolved under the decree, Mr. Cooper contends instead that the benefits of the consent decree are illusory because USDA has reserved the right in paragraphs 19 and 21 to undo the decree by regulatory fiat, depriving the farmers of any judicial relief and, thus, the district court abused its discretion in approving the decree as fair, adequate, and reasonable under Rule 23(e) of the Federal Rules of Civil Procedure. As clarified by stipulations in the briefing and oral argument on appeal, no basis exists to conclude that USDA would promulgate such a regulation under laws in effect when the decree was approved by the district court. While paragraph 19 leaves the class exposed to potential congressional enactments nullifying or modifying the consent decree, the class would bear that risk in any event, at least so long as the decree remains executory. Additionally, Mr. Cooper's contention concerning the limitation of the district court's authority by paragraph 21 is inconsistent with the plain language of that provision. Accordingly, because Mr. Cooper's contentions are unpersuasive on their own terms, and, in light of the benefits conferred on the class by the decree taken as a whole, we find no abuse of discretion by the district court, and we affirm.

### I.

The consent decree settling the class action was the product of lengthy and, at times, contentious negotiations. The background is set forth in Judge Friedman's comprehensive opinion, *Pigford,* 185

is a named appellant, however. The class representatives, the named plaintiffs in the district court, and the Secretary of Agriculture are appellees.

F.R.D. at 89–92, familiarity with which is assumed, and we repeat only the details necessary for this opinion.[2]

USDA indirectly administers programs that provide credit and other benefits to farmers. The USDA's credit and benefit programs are federally funded, but the decisions to approve or deny applications for credit or benefits are made at the county level by a committee of three to five members elected by local farmers and ranchers. In addition to acting on credit and benefit applications, the county committee appoints a county executive to assist farmers in completing their applications and to recommend to the county committee which applications should be approved. *Id.* at 86. USDA has promulgated a number of regulations governing how these officials are to administer the credit and benefit programs, but the evidence before the district court shows that USDA has exercised little oversight regarding how applications historically have been processed at the county level. *Id.* at 86–88. For years, African–American farmers, who have been significantly underrepresented on the county committees, *see id.* at 87, have complained that county officials have exercised their power in a racially discriminatory manner, resulting in delayed processing or denial of applications for credit and benefits by African–American farmers not experienced by white farmers who are similarly situated. *Id.* at 87–88. Such discriminatory treatment is prohibited by statute and by regulation. *See* 15 U.S.C. § 1691(a) (1994); 7 C.F.R. §§ 15.51, 15.52 (1999). In December 1996, the Secretary of Agriculture appointed a Civil Rights Action Team to investigate allegations of racial discrimination in the administration of USDA credit and benefit programs, and, in February 1997, the USDA Inspector General reported that USDA had a backlog of discrimination complaints in need of immediate attention.

2. The district court's opinion appears as an appendix to this opinion.

The President and the Secretary thereafter sought appropriations to carry out the recommendations to improve USDA's civil rights efforts. *Pigford,* 185 F.R.D. at 111.

On August 28, 1997, three African–American farmers filed suit on behalf of a putative class of similarly situated African–American farmers alleging racial discrimination in the administration of USDA programs and further harm from the allegedly surreptitious dismantling of USDA's Office of Civil Rights in 1983, which together were alleged to violate the Fifth Amendment, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, prohibiting discrimination in consumer credit. Following amendments to the complaint, the district court granted class certification in October 1998. *See Pigford,* 185 F.R.D. at 90. At that time, most of the farmers' ECOA claims were arguably barred by a two-year statute of limitations. *See* 15 U.S.C. § 1691e(f). Responding to petitions from class members, Congress enacted, and the President signed in November 1998, an amendment to retroactively extend the limitations period for persons who had filed administrative complaints between January 1, 1981, and July 1, 1997, for acts of discrimination occurring between January 1, 1981, and December 31, 1996.[3] A second class action, *Brewington v. Glickman,* Civ. No. 98–1693, filed in July 1998 and making similar allegations covering a different time period, was consolidated with *Pigford* for purposes of settlement, and a new class was certified. *See Pigford,* 185 F.R.D. at 90.

As the February 1999 trial date drew near, the parties' negotiations shifted from individual claims to a global settlement, *id.,* and with the assistance of a court-appointed mediator, the parties developed and agreed to a consent decree that contemplated a two-track dispute resolution mechanism to determine whether individual class members had been the victims of discrimination and, if so, the amount of monetary relief to which they were entitled. If a class member opts for resolution under Track A, "class members with little or no documentary evidence [will receive] a virtually automatic cash payment of $50,000 and forgiveness of any debt owed to USDA," *id.* at 95; whereas, class members opting for Track B resolution have the opportunity to prove their claims in a one-day mini-trial before an arbitrator and, if successful, the amount of monetary damages is not capped. *Id.* Class members dissatisfied with the opportunity for resolution of their claims under either Track A or Track B could opt out of the class within 120 days of entry of the consent decree, and file individual lawsuits. *Id.* The district court is to appoint a monitor from a list of names provided by the parties "to track and report on USDA's compliance with the terms of the Consent Decree." *Id.* at 109.

By law, the proposed consent decree could not take effect until the district court had approved it, *see* Fed.R.Civ.P. 23(e), and the district court's approval could not be granted until notice had been given to the class of the proposed settlement and a fairness hearing had been held to determine whether the "settlement is fair, adequate, and reasonable and is not the product of collusion between the parties." *Pigford,* 185 F.R.D. at 98 (quoting *Thomas v. Albright,* 139 F.3d 227, 231 (D.C.Cir.1998)). The district court held a day-long hearing in which representatives of eight organizations and sixteen individuals, including Mr. Cooper, voiced their objections to the terms of the proposed consent decree. Many, including Mr. Cooper,

---

**3.** *See* Pub.L. No. 105–277, § 741, 112 Stat. 2681 (codified at 7 U.S.C. § 2279, notes); *see also* Statement By President William J. Clinton Upon Signing H.R. 4328, 34 Weekly Comp. Pres. Doc. 2108 (Nov. 2, 1998) ("This bill will also address the long-standing discrimination claims of many minority farmers by adopting my request to waive the statute of limitations on USDA discrimination complaints that date back to the early 1980s."), *reprinted in* 1998 U.S.C.C.A.N. 582.

objected to the absence of certain forms of prospective structural relief, notwithstanding the fact that the complaint, as amended, did not seek such injunctive relief. *Id.* at 110. While USDA was likely to face billion-dollar monetary liability under the decree, no changes to the county committee system were mandated, and objectors feared that no improvements would be made to the way in which the farm credit and non-credit programs are administered. *See* Transcript of Fairness Hearing ("Tr."), Mar. 2, 1999 at Joint Appendix (JA) 388 (Mr. Bowens); 493 (Mr. Cooper). They also maintained that insufficient information had been exchanged during the discovery period leading up to the settlement. However, at the fairness hearing, neither Mr. Cooper nor his counsel voiced the objections raised now on appeal to paragraphs 19 and 21 of the decree. Instead the National Council of Community Based Organizations in Agriculture ("NCCBOA") argued to the district court that paragraph 19 "contemplates that a future statute or regulation may interfere with the relief that is provided by the decree." Tr. at JA 410. Without specifically mentioning paragraph 21, NCCBOA objected to that provision on the grounds that the class members "are remitted to contract law claims against the Government, but the contract here expressly provides that they can't have their claims

reinstated and the Government has got a defense because of its new regulation to the relief that's provided by the Consent Decree." Tr. at JA 411.

Following the hearing, the district court suggested fourteen changes to the proposed consent decree, including modifying paragraph 19 to require USDA to use its best efforts to comply with laws prohibiting discrimination and modifying paragraph 21 to make clear that the district court retained jurisdiction to enforce the consent decree with its contempt power. The class and USDA rejected the first suggestion and adopted the second. The district court then allowed another round of written objections to be filed to the revised consent decree.[4] After considering all of the objections and the entire record, the district court approved the proposed consent decree as fair under Rule 23 and ordered that the decree be entered. Mr. Cooper noted an appeal from the order, but he did not seek a stay of proceedings under the consent decree pending appeal.[5]

## II.

The law is well settled that the decision to approve a consent decree is committed to the sound discretion of the district court. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 299 (3d Cir.1998). The district

4. *Objections made directly by Mr. Cooper questioned whether class counsel truly represented the interests of the class members and suggested that the decree contain a provision rendering it void if either USDA or class counsel took steps to obstruct the district court's jurisdiction to enforce the proposed decree. Mr. Cooper's counsel, on behalf of Mr. Cooper, filed eight pages of objections, which also questioned the capacity of class counsel to represent the class, but made no mention of either paragraphs 19 nor 21 nor of the enforceability of the decree as a general matter. In addition, the North Carolina Association of Black Lawyers Land Loss Prevention Project at North Carolina Central University Law School filed a set of objections jointly with three other organizations, including NCCBOA, which stressed, among other things, the view that in light of paragraphs 19 and 21, the district court's con-*

tempt power was inadequate to enforce the decree.

5. Although the figures differ, USDA and class counsel represented in their respective briefs that more than 20,000 persons have filed claims under the decree. *See* Appellee USDA's Br. at 15; Appellee Plaintiff Class' Br. at 12. At oral argument, class counsel represented that as of February 25, 2000, decisions in 9,573 Track A cases had been rendered of which 5,746 claims were granted and paid in an amount totaling $359,125,000. Of the 3,827 Track A claims that were denied in whole or in part, one third have been appealed under the terms of the consent decree. In addition, approximately 146 class members have opted for resolution under Track B. Four cases have been completed, and eighty others are in discovery.

court's role in reviewing the decree is to protect the interests of absent class members, and that is done primarily by evaluating the terms of the settlement in relation to the strength of their case. *See Thomas,* 139 F.3d at 231. The appellate court is not to substitute its views of fairness for those of the district court and the parties to the agreement, *see Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir.1992), but is only to determine whether the district court's reasons for approving the decree evidence appreciation of the relevant facts and reasoned analysis of those facts in light of the purposes of Rule 23. *See Thomas,* 139 F.3d at 231; *see also Kickapoo Tribe v. Babbitt,* 43 F.3d 1491, 1495 (D.C.Cir.1995). Mr. Cooper bears the burden on appeal of making a "clear showing" that an abuse of discretion has occurred. *See Moore v. National Ass'n of Sec. Dealers,* 762 F.2d 1093, 1107 (D.C.Cir.1985). He has not done so; on the contrary, the district court fulfilled the requirements of Rule 23 in exemplary fashion.

On appeal Mr. Cooper has abandoned the objections he raised in the district court regarding the lack of prospective structural relief and confines his challenge to the consent decree to paragraphs 19 and 21, which he contends give USDA, in effect, the right to unilaterally withdraw from the consent decree leaving class members with no judicial remedy. Mr. Cooper thus contends that the district court erred by failing to notify class members specifically of the terms of the two paragraphs and by approving the decree without requiring alteration or deletion of the two paragraphs.[6]

■ In his opening brief, Mr. Cooper contended that USDA can use paragraph 19 to renege on its agreement in the consent decree in one of three ways: (1) Congress could pass new legislation that USDA could interpret to preclude some or all of the relief provided by the decree; (2) USDA could promulgate new regulations to the same effect without new legislation; or (3) USDA could interpret existing law to bar the relief provided in the decree without promulgating a rule. In subsequent briefing by appellees class counsel and USDA, and at oral argument, it has been clarified that there was no intent that paragraph 19 include the second and third possibilities; rather, USDA stipulates, and class counsel concurs, in their respective briefs that paragraph 19 "simply recognizes the legal reality that Congress makes the laws, and that it is the obligation of the government to perform prospectively in conformance with the then binding laws enacted by Congress." *See* Appellee USDA's Br. at 25; Appellee Plaintiff Class' Br. at 11.

With that clarification, USDA's promise to perform under the consent decree is not illusory because USDA has not reserved a unilateral right to withdraw, *cf. Gray v. American Express Co.,* 743 F.2d 10, 19 (D.C.Cir.1984) (interpreting New York

---

**6.** The paragraphs under attack provide:

19. Defendant's Duty Consistent With Law and Regulations

Nothing contained in this Consent Decree or in the Final Judgment shall impose on the defendant any duty, obligation or requirement, the performance of which would be inconsistent with federal statutes or federal regulations in effect at the time of such performance.

. . . . .

21. No Effect if Default

Subject to the terms of ¶ 17, above, [conditioning the decree's obligations on a final judgment dismissing the complaint] and following entry by the Court of Final Judgment, no default by any person or party to this consent Decree in the performance of any of the covenants or obligations under this Consent Decree, or any judgment or order entered in connection therewith, shall affect the dismissal of the complaint, the preclusion of prosecution of actions, the discharge and release of the defendant, or the judgment entered approving these provisions. Nothing in the preceding sentence shall be construed to affect the Court's jurisdiction to enforce the Consent Decree on a motion for contempt filed in accordance with ¶ 13 [requiring parties to conciliate before filing contempt motion].

The last sentence of paragraph 21 was added after the fairness hearing.

law), rather it would take action by Congress to enable USDA to withdraw from the consent decree. Consequently, under elementary principles of contract law, USDA's promise to perform was backed by consideration at the time it was made and the parties have assigned to the plaintiff class the marginal risk that Congress might nullify the agreement in some respect by future legislation. Although the evidence before the district court establishes the basis for class members' mistrust of USDA and concern that the risk may be more than hypothetical, *see Pigford*, 185 F.R.D. at 110, the fact that Congress and the President acted quickly to remove a limitations bar to the plaintiffs' recovery indicates that as of October 1998 all three branches of the federal government had taken steps to aid in the final resolution of the farmers' claims on the merits. The district court noted the priority commitment of the President and the Secretary of Agriculture, spurred by the efforts of the African–American farmers, to obtain funding to carry out recommendations improving USDA's civil rights efforts, as well as Congress' "unprecedented action of tolling the statute of limitations." *Id.* at 111. And Mr. Cooper acknowledged through counsel on appeal that he has no evidence that this three-branch commitment has waned. The district court could therefore reasonably conclude when approving the decree that the risk of a radical about-face in current federal policy was remote.

More fundamentally, even in the absence of paragraph 19, the class would bear the risk of such hypothetical legislation, at least so long as the decree remains executory. *See Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431–32, 15 L.Ed. 435 (1855); *Bell-South Corp. v. FCC*, 162 F.3d 678, 692–93 (D.C.Cir.1998); *see also Landgraf v. USI Film Products*, 511 U.S. 244, 273–274, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Rufo*

*v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).[7] Thus, we need not pass upon Mr. Cooper's' contentions concerning possible constitutional limitations on Congress' power to enact such legislation, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), nor address the ramifications of such legislation under the reasoning of *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), to conclude that the district court did not abuse its discretion by approving the proposed consent decree, as amended, which assigns a risk to the plaintiff class that it would have borne in any event.

■ As to Mr. Cooper's contention that paragraph 21 deprives the farmers of the right to ask the district court to modify the decree or reinstate their lawsuit in the unlikely event that Congress passes legislation nullifying the decree, it too relies on a misplaced concern. Paragraph 21 provides that if the government *defaults* on its obligations under the decree, the plaintiff class can enforce the decree only by motion for civil contempt. Mr. Cooper reads this provision to also "strip[ ] the district court of its authority to reopen the final judgment" if Congress enacts legislation allowing for the decree to be nullified in whole or in part. However, the very basis for Mr. Cooper's contention concerning paragraph 19 is, and USDA agrees, that USDA would not be in default under the agreement if Congress passed new legislation nullifying, or directing the Secretary to nullify by regulation, the consent decree. Because that action would not qualify as a default, the provisions of paragraph 21 would not apply. Thus, Mr. Cooper's contention that the consent decree is unfair because the class would not be able to seek relief under Rule 60(b) of the Federal Rules of Civil Procedure is mistaken. On its face, paragraph 21 does not foreclose that avenue of relief when USDA has not

---

7. It is to be noted that the relief Mr. Cooper seeks, an order vacating the decree and remanding for trial, could require that plaintiffs' cases be tried over a number of years,

*see Pigford*, 185 F.R.D. at 104, and thus could expose class members to this risk for a far longer period.

defaulted, and thus were Congress to enact the hypothesized legislation, paragraph 21 would not bar the class from seeking modification of the decree, subject to its ability to "establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393, 112 S.Ct. 748.

Moreover, not only do Mr. Cooper's contentions collapse under their own weight, but even were they to retain some persuasive force, the court must evaluate the district court's decision to approve the consent decree, with whatever shortcomings paragraphs 19 and 21 might present, in light of the agreement as a whole. *See Thomas*, 139 F.3d at 231. In that context, there is no doubt that the district court exercised its discretion well within the boundaries of the law. The serious concerns and objections to the proposed consent decree were carefully considered by the district court and balanced against the likely alternatives in a manner reflecting a considered and compassionate conclusion. *See, e.g., Pigford*, 185 F.R.D. at 101–04, 109–111. Neither Mr. Cooper nor, to our knowledge, any other class member contends at this point that the provisions of the consent decree providing monetary payments and loan forgiveness are unfair or unreasonable, and we have no occasion to consider whether these provisions are otherwise unfair or unreasonable. As a result, Mr. Cooper has failed to meet his burden to show that the enforcement provisions of the decree are so infirm as to render the entire agreement unfair or unreasonable. Furthermore, our reasons for finding Mr. Cooper's substantive contentions unpersuasive also lead us to reject his procedural contentions that the district court did not address the objections to paragraphs 19 and 21 with sufficient specificity and that notice to the class was inadequate because it did not specifically describe paragraphs 19 and 21.

■ The ultimate question before the court is whether the district court abused its discretion by approving a consent decree, the principal provisions of which are an indisputably fair and reasonable resolution of the class complaint, containing one paragraph that assigns to the class a risk it would have borne in any event and another paragraph that limits the mode of enforcing the decree in the event of default. To ask the question is to answer it. Because it is clear that no abuse of discretion occurred we do not reach the government's alternative argument concerning whether it would be equitable for this court to vacate the decree in light of the number of claims that have been resolved in reliance on the decree.

Accordingly, we affirm the order of approval of the district court.

APPENDIX

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
JUL 2 1 1999
RECEIVED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRC.
RECEIVED
JUL 2 1 1999
CLERK

TIMOTHY PIGFORD, et al.,

 Plaintiffs,

v.

DAN GLICKMAN, Secretary,
 United States Department of Agriculture,

 Defendant.

Civil Action No. 97-1978 (PLF)

CECIL BREWINGTON, et al.,

 Plaintiffs,

v.

DAN GLICKMAN, Secretary,
 United States Department of Agriculture,

 Defendant.

Civil Action No. 98-1693 (PLF)

## OPINION

Forty acres and a mule. As the Civil War drew to a close, the United States government created the Freedmen's Bureau to provide assistance to former slaves. The government promised to sell or lease to farmers parcels of unoccupied land and land that had been confiscated by the Union during the war, and it promised the loan of a federal government mule to plow that land. Some African Americans took advantage of these programs and either bought or leased parcels of land. During Reconstruction, however, President Andrew Johnson vetoed a bill to enlarge the powers and activities of the Freedmen's

Bureau, and he reversed many of the policies of the Bureau. Much of the promised land that had been leased to African American farmers was taken away and returned to Confederate loyalists. For most African Americans, the promise of forty acres and a mule was never kept. Despite the government's failure to live up to its promise, African American farmers persevered. By 1910, they had acquired approximately 16 million acres of farmland. By 1920, there were 925,000 African American farms in the United States.

On May 15, 1862, as Congress was debating the issue of providing land for freed former slaves, the United States Department of Agriculture was created. The statute creating the Department charged it with acquiring and preserving "all information concerning agriculture" and collecting "new and valuable seeds and plants; to test, by cultivation, the value of such of them as may require such tests; to propagate such as may be worthy of propagation, and to distribute them among agriculturists." An Act to establish a Department of Agriculture, ch. 71, 12 Stat. 387 (1862). In 1889, the Department of Agriculture achieved full cabinet department status. Today, it has an annual budget of $67.5 billion and administers farm loans and guarantees worth $2.8 billion.

As the Department of Agriculture has grown, the number of African American farmers has declined dramatically. Today, there are fewer than 18,000 African American farms in the United States, and African American farmers now own less then 3 million acres of land. The United States Department of Agriculture and the county commissioners to whom it has delegated so much power bear much of the responsibility for this dramatic decline. The Department itself has recognized that there has always been a disconnect between what President Lincoln envisioned as "the people's department," serving all of the people, and the

2

widespread belief that the Department is "the last plantation," a department "perceived as playing a key role in what some see as a conspiracy to force minority and disadvantaged farmers off their land through discriminatory loan practices." See Pls' Motion for Class Certification, Exh. B, Civil Rights at the United States Department of Agriculture: A Report by the Civil Rights Action Team (Feb. 1997) ("CRAT Report") at 2.

For decades, despite its promise that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity of an applicant or recipient receiving Federal financial assistance from the Department of Agriculture," 7 C.F.R. § 15.1, the Department of Agriculture and the county commissioners discriminated against African American farmers when they denied, delayed or otherwise frustrated the applications of those farmers for farm loans and other credit and benefit programs. Further compounding the problem, in 1983 the Department of Agriculture disbanded its Office of Civil Rights and stopped responding to claims of discrimination. These events were the culmination of a string of broken promises that had been made to African American farmers for well over a century.

It is difficult to resist the impulse to try to undo all the broken promises and years of discrimination that have led to the precipitous decline in the number of African American farmers in the United States. The Court has before it a proposed settlement of a class action lawsuit that will not undo all that has been done. Despite that fact, however, the Court finds that the settlement is a fair resolution of the claims brought in this case and a good first step towards assuring that the kind of discrimination that has been visited on African

3

American farmers since Reconstruction will not continue into the next century. The Court therefore will approve the settlement.

## I. BACKGROUND OF THE CASE

The plaintiffs in this case allege (1) that the United States Department of Agriculture ("USDA") willfully discriminated against them and other similarly situated African American farmers on the basis of their race when it denied their applications for credit and/or benefit programs or delayed processing their applications, and (2) that when plaintiffs filed complaints of discrimination with the USDA, the USDA failed properly to investigate and resolve those complaints. See Seventh Amended Complaint at 4-5. Plaintiffs allege that defendant's actions violated a number of statutes and the Constitution, but both sides agree that this case essentially is brought under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 ("ECOA"). See Transcript of Hearing of March 2, 1999, at 19.[1]

The Court certified this case as a class action on October 9, 1998, and preliminarily approved a Consent Decree on January 5, 1999. After a hearing held on March 2, 1999, the parties made some revisions to the proposed Consent Decree and filed a revised

---

[1] Most of the class members are complaining about racial discrimination in the USDA's credit programs. ECOA provides the statutory basis for claims of discrimination in credit transactions. See 15 U.S.C. § 1691. A small number of class members, approximately 5% of the class, complain about the USDA's administration of its benefit programs, especially its disaster relief programs. See Seventh Amended Complaint at ¶ 76. The benefit programs are not subject to ECOA, and the claims against the USDA for alleged acts of discrimination in these programs are brought under the Administrative Procedure Act, 5 U.S.C. § 706. The differences between the two types of claims lead to slight variations in the burdens of proof and the relief provided.

4

proposed Consent Decree with the Court on March 19, 1999. The Court now concludes that the revised proposed Consent Decree is fair, adequate and reasonable.

### A. Factual Background

Farming is a hard way to make a living. Small farmers operate at the whim of conditions completely beyond their control; weather conditions from year to year and marketable prices of crops to a large extent determine whether an individual farmer will make a profit, barely break even or lose money. As a result, many farmers depend heavily on the credit and benefit programs of the United States Department of Agriculture to take them from one year to the next.[2] For instance, if an early freeze kills three-quarters of a farmer's crop one year, he may not have sufficient resources to buy seeds to plant in the following season. Or if a farmer needs to modernize his operations and buy a new grain harvester in order to make his operations profitable, he often cannot afford to buy the harvester without an extension of credit. Because of the seasonal nature of farming, it also is of utmost importance that credit and benefit applications be processed quickly or the farmer may lose all or most of his anticipated income for an entire year. It does a farmer no good to receive a loan to buy seeds after the planting season has passed.

The USDA's credit and benefit programs are federally funded programs, but the decisions to approve or deny applications for credit or benefits are made locally at the county level. In virtually every farming community, local farmers and ranchers elect three to five member county committees. The county committee is responsible for approving or denying farm

---

[2] The technical differences among USDA's various credit and non-credit programs are set forth in detail in a previous Opinion of this Court. See Pigford v. Glickman, 182 F.R.D. 341, 342-44 (D.D.C. 1998).

5

credit and benefit applications, as well as for appointing a county executive who is supposed to provide farmers with help in completing their credit and benefit applications. The county executive also makes recommendations to the county committee regarding which applications should be approved. The salaries of the county committee members and the county executives are paid from federal funds, but they are not considered federal government employees. Similarly, while federal money is used to fund the credit and benefit programs, the elected county officials, not federal officials, make the decision as to who gets the federal money and who does not.

The county committees do not represent the racial diversity of the communities they serve. In 1996, in the Southeast Region, the region in the United States with the most African American farmers, just barely over 1% of the county commissioners were African American (28 out of a total of 2469). See CRAT Report at 19. In the Southwest region, only 0.3% of the county commissioners were African American. In two of the remaining three regions, there was not a single African American county commissioner. Nationwide, only 37 county commissioners were African American out of a total of 8147 commissioners -- approximately 0.45%. Id.

Throughout the country, African American farmers complain that county commissioners have discriminated against them for decades, denying their applications, delaying the processing of their applications or approving them for insufficient amounts or with restrictive conditions. In several southeastern states, for instance, it took three times as long on average to process the application of an African American farmer as it did to process the application of a white farmer. CRAT Report at 21. Mr. Alvin E. Steppes is an African American farmer from

6

Lee County, Arkansas. In 1986, Mr. Steppes applied to the Farmers Home Administration ("FmHA") for an operating loan. Mr. Steppes fully complied with the application requirements, but his application was denied. As a result, Mr. Steppes had insufficient resources to plant crops, he could not buy fertilizer and crop treatment for the crops he did plant, and he ended up losing his farm. See Seventh Amended Complaint at ¶ 14.

Mr. Calvin Brown from Brunswick County, Virginia applied in January 1984 for an operating loan for that planting season. When he inquired later that month about the status of his loan application, a FmHA county supervisor told him that the application was being processed. The next month, the same FmHA county supervisor told him that there was no record of his application ever having been filed and that Mr. Brown had to reapply. By the time Mr. Brown finally received his loan in May or June 1984, the planting season was over, and the loan was virtually useless to him. In addition, the funds were placed in a "supervised" bank account, which required him to obtain the signature of a county supervisor before withdrawing any funds, a requirement frequently required of African American farmers but not routinely imposed on white farmers. See Seventh Amended Complaint at ¶ 11.

In 1994, the entire county of Greene County, Alabama where Mr. George Hall farmed was declared eligible for disaster payments on 1994 crop losses. Every single application for disaster payments was approved by the Greene County Committee except Mr. Hall's application for four of his crops. See Seventh Amended Complaint at ¶ 5. Mr. James Beverly of Nottaway County, Virginia was a successful small farmer before going to FmHA. To build on his success, in 1981 he began working with his FmHA office to develop a farm plan to expand and modernize his swine herd operations. The plan called for loans to purchase breeding stock

7

and equipment as well as farrowing houses that were necessary for the breeding operations. FmHA approved his loans to buy breeding stock and equipment, and he was told that the loan for farrowing houses would be approved. After he already had bought the livestock and the equipment, his application for a loan to build the farrowing houses was denied. The livestock and equipment were useless to him without the farrowing houses. Mr. Beverly ended up having to sell his property to settle his debt to the FmHA. See id. at ¶ 12.

The denial of credit and benefits has had a devastating impact on African American farmers. According to the Census of Agriculture, the number of African American farmers has declined from 925,000 in 1920 to approximately 18,000 in 1992. CRAT Report at 14. The farms of many African American farmers were foreclosed upon, and they were forced out of farming. Those who managed to stay in farming often were subject to humiliation and degradation at the hands of the county commissioners and were forced to stand by powerless, as white farmers received preferential treatment. As one of plaintiffs' lawyers, Mr. J.L. Chestnut, aptly put it, African American farmers "learned the hard way that though the rules and the law may be colorblind, people are not." Transcript of Hearing of March 2, 1999, at 173.

Any farmer who believed that his application to those programs was denied on the basis of his race or for other discriminatory reasons theoretically had open to him a process for filing a civil rights complaint either with the Secretary of Agriculture or with the Office of Civil Rights Enforcement and Adjudication ("OCREA") at USDA. USDA regulations set forth a detailed process by which these complaints were supposed to be investigated and conciliated, and ultimately a farmer who was unhappy with the outcome was entitled to sue in federal court under ECOA. See Pigford v. Glickman, 182 F.R.D. 341, 342-44 (D.D.C. 1998). All the evidence

8

developed by the USDA and presented to the Court indicates, however, that this system was functionally nonexistent for well over a decade. In 1983, OCREA essentially was dismantled and complaints that were filed were never processed, investigated or forwarded to the appropriate agencies for conciliation. As a result, farmers who filed complaints of discrimination never received a response, or if they did receive a response it was a cursory denial of relief. In some cases, OCREA staff simply threw discrimination complaints in the trash without ever responding to or investigating them. In other cases, even if there was a finding of discrimination, the farmer never received any relief.

In December of 1996, Secretary of Agriculture Dan Glickman appointed a Civil Rights Action Team ("CRAT") to "take a hard look at the issues and make strong recommendations for change." See CRAT Report at 3. In February of 1997, CRAT concluded that "[m]inority farmers have lost significant amounts of land and potential farm income as a result of discrimination by FSA [Farm Services Agency] programs and the programs of its predecessor agencies, ASCS [Agricultural Stabilization and Conservation Service] and FmHA [Farmers Home Administration]. . . . The process for resolving complaints has failed. Minority and limited-resource customers believe USDA has not acted in good faith on the complaints. Appeals are too often delayed and for too long. Favorable decisions are too often reversed." Id. at 30-31.

Also in February of 1997, the Office of the Inspector General of the USDA issued a report to Secretary Glickman stating that the USDA had a backlog of complaints of discrimination that had never been processed, investigated or resolved. See Pls' Motion for Class Certification, Exh. A (Evaluation Report for the Secretary on Civil Rights Issues). The

9

Report found that immediate action was needed to clear the backlog of complaints, that the "program discrimination complaint process at [the Farm Services Agency] lacks integrity, direction, and accountability," id. at 6, and that "[s]taffing problems, obsolete procedures, and little direction from management have resulted in a climate of disorder within the civil rights staff at FSA." Id. at 1.

The acknowledgment by the USDA that the discrimination complaints had never been processed, however, came too late for many African American farmers. ECOA has a two year statute of limitations. See 15 U.S.C. § 1691e(f). If the underlying discrimination alleged by the farmer had taken place more than two years prior to the filing of an action in federal court, the government would raise a statute of limitations defense to bar the farmer's claims. For instance, some class members in this case had filed their complaints of discrimination with the USDA in 1983 for acts of discrimination that allegedly occurred in 1982 or 1983. If the farmer waited for the USDA to respond to his discrimination complaint and did not file an action in court until he discovered in 1997 that the USDA had stopped responding to discrimination complaints, the government would argue that any claim under ECOA was barred by the statute of limitations.

In 1998, Congress provided relief to plaintiffs with respect to the statute of limitations problem by passing legislation that tolls the statute of limitations for all those who filed discrimination complaints with the Department of Agriculture before July 1, 1997, and who allege discrimination at any time during the period beginning on January 1, 1981 and ending on or before December 31, 1996. See Agricultural, Rural Development, Food and Drug

10

Administration, and Related Agencies Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (codified at 7 U.S.C. § 2297, Notes).

### B. Procedural Background

From the beginning, this case has been a contentious and hard fought battle on both sides. The original complaint in this action was filed on August 28, 1997, by three African American farmers representing a putative class of 641 African American farmers. At an initial status conference on October 30, 1997, plaintiffs requested that the case be referred to Magistrate Judge Alan Kay for the purpose of discussing settlement. The government opposed that request. The Court refused to require the government to engage in settlement negotiations if it was not prepared to do so in good faith and with an open mind, but it made clear that the case would move quickly.

From plaintiffs' perspective, the most important pieces of evidence necessary to ensure speedy resolution of the case were the files of the individual farmers that were held by the government. The Court ordered both sides to comply with their obligations under Rule 26(a)(1) of the Federal Rules of Civil Procedure by November 14, 1997, and it ordered the government to provide plaintiffs with any files in its possession on any farmer who was part of the putative class. See Order of November 4, 1997. The government complied with the Court's discovery ruling, and since then has continued to provide class counsel with the files of putative class members that it has. See Def's November 17, 1997, Report to the Court.

In the meantime, a number of motions to intervene were filed on behalf of putative class members represented by other attorneys. The two attorneys who originally had

filed the Pigford action, Mr. Alexander Pires and Mr. Philip Fraas, stated in open court that any attorney was welcome to serve as of counsel in the case, on the condition that he or she would agree that (1) any compensation would be provided only under the attorneys' fees provisions of ECOA, 15 U.S.C. § 1691e(d), or other statutory fee-shifting provisions, and (2) he or she would neither collect any fees from individual farmers nor enter into a contingent fee arrangement by which the attorney would take a percentage of the farmer's settlement or award. Class counsel also represented that any putative class member on whose behalf a motion to intervene was filed would be added as a named plaintiff in an amended complaint.

The motions to intervene subsequently were withdrawn, and a number of lawyers entered appearances as of counsel for plaintiffs. The resulting team of lawyers in the case represents an extraordinary range of experience, specialties and geography: Mr. Pires and Mr. Fraas, both of Washington D.C., have represented farmers in cases against the Department of Agriculture for many years; Mr. J.L. Chestnut from Selma, Alabama, Mr. Othello Cross from Pine Bluff, Arkansas, and Mr. Dennis Sweet, from Jackson, Mississippi, all are experienced civil rights lawyers; Mr. T. Roe Frazer from Jackson, Mississippi, and Mr. Gerard Lear of Arlington, Virginia both are complex litigation and class action specialists. In addition, Mr. Hubbard Saunders, IV, an attorney from Jackson, Mississippi with nearly twenty-five years of experience, and Mr. Willie Smith from Fresno, California have worked on the case.

By mid-November of 1997, the government had rethought its original position with respect to mediation and agreed to explore the option of settlement. The parties quickly agreed upon a mediator, Mr. Michael Lewis, but an agreement on the details of the mediation process required a number of status hearings and conference calls. Finally, in late December the

12

parties agreed to stay the case for a period of six months during which time they would pursue mediation. The parties agreed to "commence" settlement discussions on a case-by-case basis but left open the possibility of discussing a global resolution of the case. See Order of December 24, 1997.

At a status conference just over two months later, however, there appeared to be a fundamental disagreement about the process of mediation: plaintiffs wanted to negotiate a settlement structure that would address the claims of all putative class members while the government continued to want to mediate claims on a case-by-case basis. Plaintiffs' counsel, in particular Mr. J.L. Chestnut, argued that the stay had to be lifted, legal issues briefed and decided, and a prompt and firm trial date set. If mediation continued on a case-by-case basis, Mr. Chestnut argued, "Well, Your Honor can look at my gray hair; I won't live that long. Many of my clients won't live that long. . . . Please, please give my people a trial date. It took us, Judge, 15 long miserable years to get here and now they want to go case by case. That will be another 15 years of injustice. The only way you can stop it, Your Honor, is a straightforward statement to the government: Settle it or try it." Transcript of Hearing of March 5, 1998, at 37-39.

The Court lifted the stay so that the parties could brief plaintiffs' motion for class certification and plaintiffs' motion for partial summary judgment on the issue of the statute of limitations. See Order of March 6, 1998. The Court also set a trial date of February 1, 1999. Id. Upon the representations of the parties that they wanted to continue trying to mediate the case with Mr. Lewis, the Court also extended the time for mediation. See Order of April 6, 1998.

In the meantime, plaintiffs had filed a second putative class action, Brewington v. Glickman, Civil Action No. 98-1693. The putative class in Brewington included those who had

13

filed their discrimination complaints with the USDA after February 21, 1997, the cutoff date for the putative Pigford class, but before July 7, 1998, the filing date of Brewington. With the exception of the date of filing of discrimination complaints, the allegations of the Brewington complaint mirrored those of the Pigford complaint.

On October 9, 1998, the Court granted the motion for class certification in Pigford. The Court also ordered the parties jointly to file a draft notice to class members by October 30, 1998. At a status hearing on October 13, 1998, plaintiffs informed the Court that Congress had passed a bill that would toll the statute of limitations for African American farmers who had filed complaints of discrimination with the USDA and that they would be withdrawing their motion for partial summary judgment on the statute of limitations issue as soon as the President signed the bill into law because that motion then would be unnecessary. On October 21, 1998, President Clinton signed into law the bill tolling the statute of limitations that had been enacted by Congress. See Agricultural, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (codified at 7 U.S.C. § 2297, Notes). The waiver of the statute of limitations provides that "a civil action to obtain relief with respect to the discrimination alleged in an eligible complaint, if commenced not later than 2 years after the enactment of this Act, shall not be barred by any statute of limitations." An "eligible complaint" is defined, in relevant part, as "a nonemployment related complaint that was filed with the Department of Agriculture before July 1, 1997 and alleges discrimination at any time during the period beginning on January 1, 1981 and ending December 31, 1996" in violation of ECOA or "in the administration of a commodity program or a disaster assistance program." See id.

14

Faced with a February 1, 1999, trial date, the parties continued their efforts at mediation with the help of Mr. Lewis. At some point after the March 5, 1998 status hearing, the focus of negotiations shifted from case-by-case analysis to structuring a global resolution of the claims of all class members. By December 1998, the parties had informed the Court that they were very close to agreeing upon a global settlement of plaintiffs' claims in both Pigford and Brewington. Finally, on January 5, 1999, the parties filed with the Court (1) a motion to consolidate the two cases, (2) a motion to alter the definition of the class certified in Pigford to include members of the Brewington action and to certify the class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, (3) a motion for preliminary approval of a proposed Consent Decree, and (4) a notice to class members. The Court consolidated the two cases, preliminarily approved the Consent Decree, approved the notice to class members, notified class members of their right to file written objections by February 15, 1999, and scheduled a fairness hearing for March 2, 1999.

Within ten days after the preliminary approval of the Consent Decree, the facilitator mailed a copy of the Notice of Class Certification and Proposed Class Settlement to all then-known members of the class.[3] The facilitator also arranged a print notification program with one-quarter page advertisements in 26 general circulation newspapers for January 21, 1999, and in 100 African-American newspapers between January 13, 1999 and

---

[3] The "facilitator" is the Poorman-Douglas Corporation. See Consent Decree at ¶ 1(i). Among other responsibilities, the facilitator is required to mail copies of the Notice of Class Certification and Proposed Class Settlement to all known class members within ten days of the Court's preliminary approval of the proposed Consent Decree and to undertake an advertising campaign notifying potential class members of the class certification and proposed class settlement. See id. at ¶¶ 3, 4.

15

January 27, 1999. See Def's Memorandum in Support of Consent Decree (Declaration of Jeanne C. Finegan). The facilitator also arranged to have a full page advertisement announcing the preliminary approval of the Consent Decree and the time and place of the fairness hearing placed in the editions of TV Guide that were distributed in an 18-state region, and a half page advertisement in the national edition of Jet Magazine. See id. In addition, the facilitator aired 44 commercials announcing the preliminary approval of the Consent Decree and the time and place of the fairness hearing on the Black Entertainment Network and aired 18 similar commercials on the Cable News Network over the course of a two-week period. The facilitator estimates that on average, the print and television notice campaign "reached 87 percent of African-American farm operators, managers or others in farm-related industries, an average frequency of 2.4 times." Id. at 6. As of February 19, 1999, the facilitator had received 15,132 telephone calls as a result of its notification campaign. Id. at 7.

The USDA exerted efforts to obtain the assistance of community based organizations, including those organizations that focus on African American and/or agricultural issues, in communicating to class members and potential class members the fact that the Court had preliminarily approved the Consent Decree and the time and place of the fairness hearing. Def's Memorandum in Support of Consent Decree (Declaration of David H. Harris). USDA officials also were notified that, to the extent possible, they had an obligation to communicate to class members information about the Consent Decree and the fairness hearing. The Court posted a copy of the proposed Consent Decree and the Notice of Class Certification on the Internet Website of the United States District Court for the District of Columbia. Finally, class counsel held meetings in counties throughout the country, particularly in the South, to notify

16

farmers of the settlement, the process for filing a claim package and the time, place and purpose of the fairness hearing.

The Court timely received approximately eighteen written objections from organizations or individuals. See Order of February 25, 1999. The Court also received a number of letters after the February 15, 1999 deadline which it also has considered. With the exception of one objection filed after the hearing, see Order of March 11, 1999, the Court has considered all letters and filings received before and since the hearing that have expressed objections to or comments on the proposed Consent Decree. Class counsel and counsel for the government also filed memoranda in support of the proposed Consent Decree and supplemental responses to the objections raised.

The Court conducted a fairness hearing on March 2, 1999, which lasted an entire day. The Court allocated time for all objectors who previously had filed written objections to the Consent Decree and also allocated time at the end of the day for others who wished to express their views. See Order of February 25, 1999. The Court provided time for class counsel and counsel for the government to explain the proposed Consent Decree and to discuss their view of its fairness. The Court heard from representatives of eight organizations that had filed written objections, six individuals who had filed written objections and ten individuals who had not filed written objections. The Court also heard from class counsel, counsel for the government and the mediator.

After the hearing, the Court sent a letter to the parties summarizing some of the objections that had been raised at the hearing and suggesting changes to the proposed Consent Decree that might alleviate some of the concerns raised. The Court indicated that it would not

17

issue a final ruling on the fairness of the proposed Consent Decree until March 19, 1999, in the event that the parties wanted to file a revised proposed Consent Decree addressing the concerns raised at the hearing and by the Court. By letter of March 19, 1999, the parties transmitted to the Court a revised proposed Consent Decree which includes those changes or clarifications that the parties believed they could make to the proposed Consent Decree without fundamentally altering the framework and basis for their agreement. The Court posted the revised Consent Decree to the Court's Internet Website and issued an order granting any objector leave to file any comments with respect to the revisions to the proposed Consent Decree by March 29, 1999. The revised proposed Consent Decree now is before the Court to determine whether it is fair, reasonable and adequate.

## II. CLASS CERTIFICATION

The Court originally certified a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure for purposes of determining liability. The class was defined as

> All African-American farmers who (1) farmed between January 1, 1983, and February 21, 1997; and (2) applied, during that time period, for participation in a federal farm program with USDA, and as a direct result of a determination by USDA in response to said application, believed that they were discriminated against on the basis of race, and filed a written discrimination complaint with USDA in that time period.

Pigford v. Glickman, 182 F.R.D. at 352. Plaintiffs had asserted that the class could be certified under either Rule 23(b)(2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure, but the Court found that it was most appropriate for purposes of determining liability to certify a class under Rule 23(b)(2), governing class actions seeking primarily injunctive or declaratory

18

relief. At the time, the Court also noted that "[i]f liability is found and the case reaches the remedy stage, the Court will have to determine the most appropriate mechanism for determining remedy. It is possible that at that point it would be appropriate to certify a class pursuant to Rule 23(b)(3). . . ." Id. at 351 *(citing Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) (in class action seeking both injunctive and monetary relief, court may adopt "hybrid" approach and certify (b)(2) class for former and (b)(3) class for latter)).

By Order of January 5, 1999, upon motion of the parties, the Court vacated the Order certifying the class and certified a new class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The newly certified class is defined as:

> All African American farmers who (1) farmed, or attempted to farm, between January 1, 1981 and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal farm credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application.

Order of January 5, 1999.

There are three changes to the substantive definition of the class. The first change relates to the time frame within which a class member is required to have filed his or her discrimination complaint with the USDA. Under the original class definition, a class member was required to have filed his complaint with the USDA before February 21, 1997. The putative class in Brewington included those who had filed their complaints of

19

discrimination with the USDA between February 21, 1997, the cutoff date in Pigford, and July 7, 1998, the date of filing of the Brewington action.

The definition of the class certified by Order of January 5, 1999, modifies the class definition so that the filing date is consistent with the recently-enacted legislation tolling the statute of limitations. See Agricultural, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (codified at 7 U.S.C. § 2297, Notes). The legislation specifies that in order to toll the statute of limitations, a farmer must have filed his complaint of discrimination with the USDA before July 1, 1997, and the new class definition includes the same cut-off date. The resulting class has a broader definition than the original Pigford class but a slightly narrower definition than the proposed class definition in Brewington. The members of the proposed Brewington class who are not a part of the newly certified class -- that is, those who filed discrimination complaints after July 1, 1997 -- are on a different legal footing because the statute of limitations has not been tolled for them and resolution of their claims therefore is not appropriate in this action.

The second change also involves timing issues. The original class definition specified that class members must have farmed between January 1, 1983, and February 21, 1997, and applied for a credit or benefit program during that same time period. The definition of the class certified by Order of January 5, 1999, requires class members to have farmed or attempted to farm between January 1, 1981, and December 31, 1996, and to have applied for a credit or benefit program during that time period. As with the changed discrimination complaint filing dates, this change in class definition is consistent with the recently-enacted

20

legislation tolling the statute of limitations. See Agricultural, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (codified at 7 U.S.C. § 2297, Notes).

The third change relates to the way in which a class member's complaint of discrimination was transmitted to the USDA. Under the original class definition, a class member must have filed a "written" complaint of discrimination with the USDA. The revised class definition provides that the class member must have "filed a discrimination complaint," and under the terms of the proposed Consent Decree, class members who have participated in "listening sessions" or have complained to members of Congress in certain case are deemed to have "filed" a discrimination complaint. See Consent Decree at ¶ 1(h). None of the substantive changes to the class definition in any way affects the Court's analysis or conclusion that the case properly is certified as a class action. See Pigford v. Glickman, 182 F.R.D. at 344-45.

The primary difference between the class certified by the Court on October 9, 1998 and the class certified by the Court on January 5, 1999, is more procedural than substantive: the former was certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure for purposes of determining whether the USDA is liable to class members and the latter was certified for all purposes pursuant to Rule 23(b)(3).[4] Rule 23 provides that all class

---

[4] An action may appropriately be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

An action may appropriately be certified pursuant to Rule 23(b)(3) of the

21

members in a Rule 23(b)(3) class action are entitled to notice and an opportunity to exclude themselves from -- or "opt out" of -- the class and pursue individual remedies. See Rule 23(c)(2), Fed. R. Civ. P. The Rule contains no explicit opt-out provision with respect to a class certified pursuant to Rule 23(b)(1) or Rule 23(b)(2), although a court may have discretion to permit class members to opt out of the class in (b)(1) and (b)(2) actions. See Eubanks v. Billington, 110 F.3d at 92-95. The parties in this case agreed that it was more appropriate -- and fairer to members of the class -- to ask the Court to certify the class under Rule 23(b)(3) for all purposes, particularly since the proposed settlement involves primarily monetary relief. See id. at 95. The decision to certify the class pursuant to Rule 23(b)(3) was made largely in order to allow class members to opt out of the class if they wanted to pursue their remedies individually either before the USDA or by separate court action.

The Court already has determined that a class exists and that the class meets the four criteria of Rule 23(a) of the Federal Rules of Civil Procedure. See Pigford v. Glickman, 182 F.R.D. at 346-50. Because the Court has certified the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure, it also must ensure that the separate and additional requirements of (b)(3) are satisfied before approving the proposed settlement. See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 622 (1997) (court's fairness analysis for settlement purposes under Rule 23(e) cannot substitute for determination whether class is appropriately certified in the first place); Thomas v. Albright, 139 F.3d 227, 234 (D.C. Cir.) (requirements

---

Federal Rules of Civil Procedure if the Court finds that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

22

of predominance and superiority in subsection (b)(3) are additional to requirements of subsection (a) which apply to all class actions), *cert. denied*, 119 S.Ct. 576 (1998).

Rule 23(b)(3) requires the Court to find (1) that questions of law or fact common to members of the class predominate over questions affecting only individual members, and (2) that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Fed. R. Civ. P. It is designed to cover cases in which a class action would promote "'uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' The Advisory Committee had dominantly in mind vindication of 'the right of groups of people who individually would be without effective strength to bring their opponents into court at all.'" Amchem Products, Inc. v. Windsor, 521 U.S. at 615, 617 (quoting Rule 23, Fed. R. Civ. P., Adv. Comm. Notes). This is just such a case.

The ultimate settlement of this action envisions the creation of a mechanism on a class-wide basis that will then be utilized to resolve the individual claims of class members outside the traditional litigation process, most of them (Track A) in a rather formulaic way. Most members of the class lack documentation of the allegedly discriminatory transactions at issue. Without any documentation of those transactions, it would be difficult if not impossible for an individual farmer to prevail in a suit in federal court under a traditional preponderance of the evidence standard. The parties acknowledge, however, that it is not the fault of class members that they lack records. Since class members' lack of documentation is at least in part attributable to the passage of time which has been exacerbated by the USDA's failure to timely process complaints of discrimination, there is a common issue of whether and how best to

23

provide relief to class members who lack documentation, and that common issue "predominate[s] over any questions affecting only individual members." _See_ Rule 23(b)(3), Fed. R. Civ. P. This class action and its settlement as proposed in the Consent Decree provide a mechanism to address that common issue. _See Amchem Products, Inc. v. Windsor_, 521 U.S. at 619 ("Settlement is relevant to a class certification").

In addition to the lack of documentation making individual adjudication of most claims so difficult, the sheer size of the class makes the prospect of individual adjudication of damages virtually unmanageable. For this or any other court to adjudicate the individual claims of the 15,000 to 20,000 African American farmers now estimated to be members of the class would take years or perhaps even a decade or more. Any "fair and efficient" resolution of the claims therefore necessitates the implementation of some sort of class-wide mechanism such as the creative and speedy Track A/Track B procedures proposed by the parties in the Consent Decree. The Court therefore finds that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." _See_ Rule 23(b)(3), Fed. R. Civ. P. The Court concludes that this action appropriately is certified for resolution pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The remaining question is whether the proposed Consent Decree is fair, adequate and reasonable under Rule 23(e).

### III. PROVISIONS OF PROPOSED CONSENT DECREE

The proposed Consent Decree, as revised after the fairness hearing and jointly filed by the parties on March 19, 1999, is a negotiated settlement that resolves all of the claims raised by plaintiffs in the Seventh Amended Complaint. The purpose of the Consent Decree is

to ensure that in the future all class members in their dealings with the USDA will "receive full and fair treatment" that is "the same as the treatment accorded to similarly situated white persons." Consent Decree at 1-2. As with all settlements, it does not provide the plaintiffs and the class they represent with everything they sought in the complaint. Instead it is a negotiated settlement intended to achieve much of what was sought without the need for lengthy litigation and uncertain results. See Stewart v. Rubin, 948 F.Supp. 1077, 1087 (D.D.C. 1996) ("inherent in compromise is a yielding of absolutes and an abandoning of highest hopes"), aff'd 124 F.3d 1309 (D.C. Cir. 1997). It is impossible to know precisely how much the overall settlement in this case will cost the government, in part because the exact size of the class has not been determined and because the Consent Decree provides for debt relief that is dependent on the amount of debt that individual class members owe to the USDA, but plaintiffs estimate that the settlement is worth at least $2.25 billion, the largest civil rights settlement in the history of this country. See Pls' Response to Post-Hearing Submissions at 7.

The Consent Decree accomplishes its purposes primarily through a two-track dispute resolution mechanism that provides those class members with little or no documentary evidence with a virtually automatic cash payment of $50,000, and forgiveness of debt owed to the USDA (Track A), while those who believe they can prove their cases with documentary or other evidence by a preponderance of the evidence -- the traditional burden of proof in civil litigation -- have no cap on the amount they may recover (Track B). Those who like neither option provided by the Consent Decree may opt out of the class and pursue their individual remedies in court or administratively before the USDA. The essential terms of the proposed Consent Decree and settlement are summarized below.

25

Under the terms of the proposed Consent Decree, any class member has the right to opt out of the class and pursue his remedies either administratively before the USDA or in a separate court action. See Consent Decree at ¶ 2(b). A class member who opts out of the class cannot collect any relief under the settlement, but he retains all of his legal rights to file his own action against the USDA. In other words, if a class member opts out of the class, nothing in this settlement affects him. Any class member who wishes to opt out of the class must file a written request with the facilitator within 120 days of the date on which the Consent Decree is entered. See id.

Those who choose to remain in the class have 180 days from the entry of the Consent Decree within which to file their claim packages with the facilitator. Consent Decree at ¶ 5(c).[5] When a claimant submits his claim package, he must include evidence that he filed a discrimination claim with the USDA between January 1, 1981 and July 1, 1997. See id. at ¶ 5(b).[6] In the absence of documentation that a complaint was filed with the USDA, a claimant may submit a declaration from "a person who is not a member of the claimant's family" stating

---

[5] The Court may grant an extension of this 180 day period "where the claimant demonstrates that his failure to submit a timely claim was due to extraordinary circumstances beyond his control." Consent Decree at ¶ 5(g).

[6] For a claimant who otherwise meets the class definition but who filed his complaint of discrimination after July 1, 1997, the claims package will be forwarded to JAMS-Endispute, Inc. JAMS-Endispute, Judicial Arbitration and Mediation Services Endispute, is a California-based corps of retired judges with offices throughout the country that provides alternative dispute resolution mechanisms. JAMS-Endispute will determine whether the claimant should be allowed to proceed as a class member despite his failure to timely file his discrimination complaint. See Consent Decree at ¶¶ 1(a)(ii), 6.

26

that he or she has first-hand knowledge that the claimant filed the complaint. _See id._[7] A claimant also must include a certification from an attorney stating that the attorney has a good faith belief in the truth of the factual basis of the claim and that the attorney will not require compensation from the claimant for his or her assistance. _See id._ at ¶ 5(e).[8]

At the time that they submit their claim packages, claimants asserting discrimination in credit transactions also must choose between two options: adjudication of their claims under the Track A mechanism or arbitration of their claims under the Track B mechanism. Consent Decree at ¶ 5(d).[9] The choice made between Track A and Track B has enormous significance. Under Track A, the class member has a fairly low burden of proof but his recovery is limited. Under Track B, there is a higher burden of proof but the recovery is unlimited. The claims facilitator, the Poorman-Douglas Corporation, has 20 days after the filing of a claims package within which to determine whether the claimant is a member of the class and, if he is, to forward the materials to counsel for the USDA and to the appropriate Track A or Track B decision-maker. _Id._ at ¶ 5(f)

---

[7] For purposes of the proposed Consent Decree, a "discrimination complaint" means either a communication directly from the class member to the USDA or a communication from the claimant to a member of Congress, the White House, or a state, local, or federal official who forwarded the communication to the USDA asserting that the USDA had discriminated against the claimant on the basis of race in connection with a federal farm credit transaction or benefit application. Consent Decree at ¶ 1(h).

[8] Class counsel is available to perform these services without charge to the claimant.

[9] Claimants asserting discrimination in non-credit benefit programs are only entitled to proceed under Track A. Consent Decree at ¶ 5(d).

Under Track A, a claimant must submit "substantial evidence" demonstrating that he or she was the victim of race discrimination. <u>See</u> Consent Decree at ¶¶ 9(a)(i), 9(b)(i). Substantial evidence means something more than a "mere scintilla" of evidence but less than a preponderance. <u>See</u> <u>Burns v. Office of Workers' Compensation Programs</u>, 41 F.3d 1555, 1562 n.10 (D.C. Cir. 1994). Put another way, substantial evidence is such "relevant evidence as a reasonable mind might accept to support [the] conclusion," even when "a plausible alternative interpretation of the evidence would support a contrary view." <u>Secretary of Labor v. Federal Mine Safety and Health Review Comm'n</u>, 111 F.3d 913, 918 (D.C. Cir. 1997).[10]

A claimant asserting discrimination in a credit transaction can satisfy this burden by presenting evidence of four specific things: (1) that he owned or leased, or attempted to own or lease, farm land; (2) that he applied for a specific credit transaction at a USDA county office between January 1, 1981 and December 31, 1996; (3) that the loan was denied, provided late, approved for a lesser amount than requested, encumbered by restrictive conditions, or USDA failed to provide appropriate loan service, and such treatment was less favorable than that accorded specifically identified, similarly situated white farmers; and (4) that USDA's treatment of the loan application led to economic damage to the class member. <u>See</u> Consent Decree at ¶ 9(a)(i). A claimant asserting discrimination only in a non-credit benefit program can satisfy his burden by presenting evidence (1) that he applied for a specific non-credit benefit program at a USDA county office between January 1, 1981 and December 31, 1996, and

---

[10] The Consent Decree defines "substantial evidence" as "such relevant evidence as appears in the record before the adjudicator that a reasonable person might accept as adequate to support a conclusion after taking into account other evidence in the record that fairly detracts from that conclusion." Consent Decree at ¶ 1(l).

28

(2) that his application was denied or approved for a lesser amount then requested and that such treatment was less favorable than that accorded to specifically identified, similarly situated white farmers. See id. at ¶ 9(b)(i).

The USDA has sixty days after it receives notice of a Track A referral to provide the adjudicator and class counsel with any information relevant to the issues of liability and damages. Consent Decree at ¶ 8. After receiving any material from the USDA, the facilitator will either make a recommendation with respect to whether the claim should be approved or indicate its inability to make a recommendation. The entire packet of material, including the submissions by the claimant and the USDA and the recommendation of the facilitator, then is referred to a member of JAMS-Endispute, Inc., for a decision which is to be made within 30 days. See id. at ¶ 9(a). That decision is final, except that the Monitor, whose responsibilities are discussed further below, shall direct the adjudicator to reexamine the claim if he determines that "a clear and manifest error has occurred" that is "likely to result in a fundamental miscarriage of justice." See id. at ¶¶ 9(a)(v), 9(b)(v), 12(b)(iii).

If the adjudicator finds in the claimant's favor and the claim involves discrimination in a credit transaction, the claimant will receive (1) a cash payment of $50,000; (2) forgiveness of all debt owed to the USDA incurred under or affected by the program that formed the basis of the claim; (3) a tax payment directly to the IRS in the amount of 25% of the total debt forgiveness and cash payment; (4) immediate termination of any foreclosure proceedings that USDA initiated in connection with the loan(s) at issue in the claim; and (5) injunctive relief including one-time priority loan consideration and technical assistance. Consent Decree at ¶¶ 9(a)(iii); 11. If the adjudicator finds in the claimant's favor and the

29

claim involves discrimination in a benefit program, the claimant will receive a cash payment in the amount of the benefit wrongly denied and injunctive relief including one-time priority loan consideration and technical assistance. Id. at ¶ 9(b)(iii).

Track B arbitration is the option for those who have more extensive documentation of discrimination in a credit transaction. Under Track B, an arbitrator will hold a one day mini-trial and then decide whether the claimant has established discrimination by a preponderance of the evidence. Consent Decree at ¶ 10.[11] Class counsel will represent any claimant who chooses Track B, or a claimant may be represented by counsel of his choice if he so desires. Track B is designed to balance the need for prompt resolution of the claim with the need to provide adequate discovery and a fair hearing. The entire Track B process will take a maximum of 240 days. During the first 180 days, there is a mechanism for limited discovery and depositions of witnesses. Following the one day mini-trial, the arbitrator will render a decision within 30 to 60 days. Id. at ¶ 10(g).

If the arbitrator finds that the claimant has demonstrated by a preponderance of the evidence that he was the victim of racial discrimination and that he suffered damages from that discrimination, the claimant will be entitled to actual damages, the return of inventory property that was foreclosed and other injunctive relief, including a one-time priority loan consideration. Consent Decree at ¶¶ 10(g), 11. As with Track A claims, the decision of the arbitrator is final except that the Monitor shall direct the arbitrator to reexamine the claim if he

---

[11] The arbitrator will either be Mr. Michael Lewis, the mediator, or will be a person selected by Mr. Lewis from a list of arbitrators pre-approved by class counsel and counsel for the government. See Consent Decree at ¶ 1(b); Letter of March 19, 1999 from the Parties to the Court at ¶ 1.

30

determines that "a clear and manifest error has occurred" that is "likely to result in a fundamental miscarriage of justice." See id. at ¶¶ 10, 12(b)(iii).

The proposed Consent Decree also provides for an independent Monitor who will serve for a period of five years following the entry of the decree. The Monitor will be appointed by the Court from a list of names proposed by the parties and cannot be removed "except upon good cause." Consent Decree at ¶ 12(a). The Monitor is responsible for making periodic written reports to the Court, the Secretary of Agriculture, counsel for the government and class counsel, reporting on the good faith implementation of the Consent Decree and efforts to resolve disputes that arise between the parties under the terms of the decree. Id. at ¶ 12(b).[12] He or she will be available to class members and members of the public through a toll-free telephone number to facilitate the lodging of Consent Decree complaints and to expedite their resolution. Id. at ¶ 12(b)(iv).

The Court retains jurisdiction to enforce the Consent Decree through contempt proceedings. Consent Decree at ¶ 21. If one side believes that the other side has violated the terms of the Consent Decree, there is a mandatory procedure for attempting to resolve the problem with the assistance of the Monitor that the parties must follow before filing a contempt motion with the Court, but the Court remains available in the event that the terms of the decree are violated. Id. at ¶ 13. Finally, the Consent Decree provides that class counsel shall be

---

[12] The parties indicated in their letter of March 19, 1999, that one of the changes to the original Consent Decree would be that the Monitor would provide copies of his report to the Court. That change was not reflected in the revised Consent Decree that was filed by the parties on March 19, 1999, but the parties have since filed a corrected page 21 of the revised Consent Decree so that the Monitor in fact will be required to provide copies of the report to the Court. See Notice of Filing of April 9, 1999.

entitled to reasonable attorneys' fees and costs under ECOA, 15 U.S.C. § 1691e(d), and under

the Administrative Procedure Act, 28 U.S.C. § 2412(d), for the filing and litigation of this

action and for implementation of the Consent Decree. Id. at ¶ 14(a).

### IV. FAIRNESS OF PROPOSED CONSENT DECREE

Under Rule 23 of the Federal Rules of Civil Procedure, no class action may be

dismissed, settled or compromised without the approval of the Court. Rule 23(e), Fed. R.

Civ. P. Before giving its approval, the Court must provide adequate notice to all members of

the class, id., conduct a "fairness hearing," and find, after notice and hearing, that the

"settlement is fair, adequate and reasonable and is not the product of collusion between the

parties." Thomas v. Albright, 139 F.3d at 231. In performing this task, the Court must protect

the interests of those unnamed class members whose rights may be affected by the settlement of

the action.

In this circuit there is "no obligatory test" that the Court must use to determine

whether a settlement is fair, adequate and reasonable. Osher v. SCA Realty I, Inc., 945

F.Supp. 298, 303-04 (D.D.C. 1996). Instead the Court must consider the facts and

circumstances of the case, ascertain what factors are most relevant in the circumstances and

exercise its discretion in deciding whether approval of the proposed settlement is fair.[13] By far

---

[13] The Third Circuit has adopted a nine-factor test for determining the fairness of a settlement of a class action, see Girsh v. Jepson, 521 F.2d 153 (3ᵈ Cir. 1975), while the Tenth Circuit has adopted a four factor test, see Gottlieb v. Wiles, 11 F.3d 1004, 1014 (10ᵗʰ Cir. 1993), and the Eleventh Circuit has developed a six factor test. See Bennett v. Behring Corp., 737 F.2d 982 (11ᵗʰ Cir. 1984). Other circuits, including ours, have not imposed such rigid sets of factors, instead recognizing that the relevant factors may vary depending on the factual circumstances. See Thomas v. Albright, 139 F.3d at 231; Torrisi v. Tucson Elec. Power Co.,

the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery that plaintiffs would realize if the case went to trial. See Thomas v. Albright, 139 F.3d at 231 ("The court's primary task is to evaluate the terms of the settlement in relation to the strength of plaintiffs' case"); Isby v. Bayh, 75 F.3d 1191, 1199 (7th Cir. 1996) ("the relative strength of plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration"); Maywalt v. Parker and Parsley Petroleum Co., 67 F.3d 1072, 1079 (2nd Cir. 1995) ("[t]he primary concern is with the substantive terms of the settlement: Basic to this is the need to compare the terms of the compromise with the likely rewards of litigation") (internal citations and quotations omitted). Having carefully considered all of the objections that have been filed with the Court or expressed at the fairness hearing in relation to the strength of plaintiffs' case, the Court concludes that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties.[14]

---

8 F.3d 1370, 1375-76 (9th Cir. 1993), *cert denied sub nom,* Reilly v. Tucson Elec. Power Co., 512 U.S. 1220 (1994). To the extent that the factors enumerated by the other circuits are at all relevant to the determination of whether this Consent Decree is fair, adequate and reasonable, however, the Court has considered and addressed those factors in this Opinion.

[14] The Court has received written objections or comments from the following organizations: Black Farmers and Agriculturists Assoc.; Black Farmers of North Carolina; Central Piedmont Economic Assoc.; Concerned Black Farmers of Tennessee, Arkansas, Mississippi, Georgia and North Carolina; Coordinating Council of Black Farm Groups; Kansas Black Farmers Assoc.; Land Loss Prevention Project; Federation of Southern Cooperatives Land Assistance Fund; Lawyers' Committee for Civil Rights Under Law; NAACP; National Black Farmers; National Council of Community Based Organizations in Agriculture; National Family Farm Coalition; Oklahoma Black Farmers and Agriculturalists Assoc.; and United States Dept. of Agriculture Coalition of Minority Employees.

The Court has received written objections or comments from the following

*A. The Process of Settlement*

Preliminarily, the Court considers those objections that address the fairness of the way in which the settlement negotiations were conducted, the amount of discovery completed at the time of settlement, the definition of the class, whether there is any evidence of collusion between class counsel and counsel for the government, and whether class members have had adequate notice and opportunity to be heard on the proposed settlement. *See Thomas v. Albright*, 139 F.3d at 231; *Durrett v. Housing Authority of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *Mars Steel v. Continental Ill. Nat. Bank and Trust*, 834 F.2d 677, 683 (7th Cir. 1987); *Girsh v. Jepson*, 521 F.2d 153 (3rd Cir. 1975); *Osher v. SCA Realty I, Inc.*, 945 F.Supp. at 304.

---

individuals (on behalf of themselves and/or on behalf of other class members): Theodore F.B. Bates; Robert R. Binion; Abraham Carpenter, Jr.; Leonard C. Cooper; Harold M. Dunkelberger; George and Larry Ephfrom; Percy Gooch, Sr.; Estell Green, Jr.; Patricia Gibson Green; Brown J. Hawkins; Clarence Hardy; George and Patricia Hildebrandt; George Hobbs; Dave J. Miller; Jessie Nimmons; Timothy C. Pigford; Amelia Roland Washington; Roy L. Rolle, Jr.; Luis C. Sanders; Herbert L. Skinner, Jr.; Gregory R. Swecker; V.J. Switzer; George M. Whitehead; Gladys R. Todd and Griffin Todd, Sr.; Andrew Williams; Jerome Williams; and Eddie and Dorothy Weiss.

All of the organizations and most of the individuals who had submitted written comments or objections spoke at the hearing on March 2, 1999. In addition, the following individuals spoke at the hearing: Mattie Mack; Kevin Pyle; Sherman Witchler; Eddie Slaughter; Ridgeley Mu'Min Muhammed; Willie Frank Smith; John Bender; Troy Scroggins; and Willie Head.

All of the objections and comments, whether received in the form of letters to the Court or as formal filings, have been filed as part of the official record of this case. To the extent possible, the Court has attempted to address all of the objections that have been raised. Whether or not specifically mentioned in this Opinion, the Court has carefully considered the objections and appreciates the extent to which the objectors have shared their thoughts and views.

### 1. Timing of Settlement and Extent of Discovery Completed

Some of the objectors maintain that settlement came too early and that class counsel undertook insufficient discovery in this case before settling it. A review of the history of the case, however, reveals that "[t]here has been a literal mountain of discovery provided and reviewed." Transcript of Hearing of March 2, 1999 at 170 (Comments of Mr. J.L. Chestnut). Less than three months after the case was filed, the Court ordered the USDA to open its files to plaintiffs within fifteen days. On the fifteenth day, the government provided plaintiffs with ten boxes of documents containing approximately 35,000 to 40,000 pages of records related to approximately 105 pending claims of race discrimination. See Def's November 17, 1997 Report to the Court, Declaration of Arnold Grundeman at ¶ 4. Three days later, the government delivered an additional 20,000 pages related to another 30 pending cases of discrimination. See id. at ¶ 5. At the time, the government represented that it was continuing to search for files, many of which had already been sent to a federal records repository. Since that time, the government has continued to provide plaintiffs with the files of class members.

The problem for plaintiffs has been that files simply do not exist for many class members. Providing additional time for discovery would not have solved that problem. As class counsel has pointed out, on the issue of liability of the USDA, the government's own documents and own admissions are the most damning evidence. See Transcript of Hearing of March 2, 1999 at 184 (Comments of Mr. Alexander Pires) ("I have an office full of admissions. I have tape recordings of Mr. Glickman. I have tape recordings of Governemnt officials. I've interviewed everybody there is to interview. I have documents. I have the CRAT Report

35

annotated. I have all the [Office of the Inspector General] Reports"). There really was no other discovery that could have made a difference. The same is true on the issue of damages. The government delivered to class counsel all of the files it had on individual class members. But without documentary evidence that does not exist, an individual farmer would be hard-pressed to provide evidence beyond his own testimony, and additional discovery from the government would not be helpful.

In addition, a relatively extensive amount of litigation had occurred by the time the parties agreed to a settlement. The issue of class certification had been extensively briefed by the parties and decided by the Court. Plaintiffs' motion for summary judgment on the issue of the statute of limitations was fully briefed when the statute of limitations was tolled by legislative action. The government also had filed a motion for judgment on the pleadings and for partial summary judgment that was fully briefed. In sum, the discovery, investigation and legal research conducted by class counsel before entering into settlement was thorough and supports the fairness and reasonableness of the settlement. See Isby v. Bayh, 75 F.3d at 1200.

### 2. Class Definition

The class is defined to include all African American farmers who (1) farmed, or attempted to farm, between January 1, 1981 and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal farm credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit

36

application. Some characterize this class definition as too narrow. They claim that the class should be broadened to include all African American farmers who claim to have faced discrimination in credit transactions or benefit programs with the USDA, regardless of whether they filed a complaint of discrimination with the USDA.

The legal issues for those who never have filed a discrimination complaint, however, are much more difficult than those facing the members of the class as currently defined. The statute of limitations issue still exists for those who never have filed complaints of discrimination because Congress tolled the statute of limitations only for those who filed discrimination complaints by July 1, 1997. Moreover, from the beginning, plaintiffs' complaint only sought relief for those who had filed discrimination complaints with the USDA. Accordingly, the Consent Decree in this case cannot provide relief for those who never purported to complain to the USDA in any way about the alleged discrimination. Cf. United States v. Microsoft, 56 F.3d 1448, 1460 (D.C. Cir. 1995).

Some also have objected that the class as currently defined does not include all members of the putative Brewington class because under the current class definition, the farmer is required to have filed a complaint of discrimination prior to July 1, 1997, while the proposed class in Brewington would have included African American farmers who had filed their discrimination complaints prior to July 7, 1998. As previously discussed, see page 20 above, the statutory waiver of ECOA's two-year statute of limitations as recently enacted by Congress applies only to those farmers who filed complaints of discrimination by July 1, 1997. The claims of those who do not meet that deadline face separate and additional legal barriers not faced by the class as currently defined. Broadening the class would inject legal and factual issues into the

37

case that are not now present and would only serve to hinder a fair, reasonable and adequate settlement for the African American farmers who are a part of the class as currently defined. The Court therefore concludes that this class definition is appropriate.

The Consent Decree also requires each class member to provide proof that he filed a "discrimination complaint" with the USDA. The term "discrimination complaint" is defined broadly to include "a communication from a class member directly to USDA, or to a member of Congress, the White House, or a state, local or federal official who forwarded the class member's communication to USDA, asserting that USDA had discriminated against the class member on the basis of race in connection with a federal farm credit transaction or benefit application." Consent Decree at ¶1(h). In the absence of specified documents, a class member may submit an affidavit from a non-family member stating that he or she has personal knowledge that a discrimination complaint was filed and describing the way in which it was filed. See Consent Decree at ¶ 5.

Some objectors maintain that it is unfair to require an affidavit from someone who is not a family member because, as Mr. Vernon Breckinridge put it, "getting loans from USDA is just like you go to a normal bank and get a loan. You don't normally go around and tell everybody in the neighborhood that you've gone to the bank to secure a loan." Transcript of Hearing of March 2, 1999 at 101. While it may be that some will be precluded from obtaining relief because they cannot use affidavits from family members, the class membership determination is designed to be mechanistic so that it can be done quickly by the facilitator. If family members were permitted to submit affidavits, the facilitator would be required to make

38

credibility determinations that inevitably would slow the process of determining class membership.

### 3. Asserted Collusion

The Court finds that there is absolutely no evidence of collusion between the class counsel and counsel for the government. See Thomas v. Albright, 139 F.3d at 231. From the outset, all settlement negotiations were conducted in the presence of the mediator, Mr. Michael Lewis, a neutral and detached mediator with twenty-five years of experience who has mediated many complex class action cases including employment and environmental cases. Mr. Lewis has stated quite emphatically that there was no collusion in this case: "If this case represented collusion or the negotiations in this case represented collusion I as a mediator never ever want to mediate a case in which the parties are at each others' throats. To term this negotiation intensive . . . understates the difficulty. This was an arduous negotiation. It took a year. It was hard fought." Transcript of Hearing of March 2, 1999 at 21-22.

Nor has the Court has seen any evidence of collusion or other impropriety on the part of counsel on either side. From the day this case was filed, Mr. Alexander Pires has tenaciously asserted that his clients had a right to receive relief from the government. Even faced with difficult statute of limitations issues and a serious lack of documentation, he has never wavered from his fundamental position that the government had wronged generations of African American farmers and must provide compensation. Even when settlement negotiations were ongoing, both sides maintained their positions and continued to assert the interests of their respective clients in every filing and at every status conference. At the status hearing on March

39

20, 1998, for example, Mr. Chestnut pleaded for a trial date because he had no faith that the case would settle and he wanted to protect the interests of the class. Government counsel continued to file motions and protect the legal interests of the USDA. Certainly the Court can attest to the fact that the parties litigated vigorously all of the issues that were or logically could have been raised.

### 4. Notice, Opportunity to Be Heard and Reaction of the Class

When a class is certified and a settlement is proposed, the parties are required to provide class members with the "best notice practicable under the circumstances." Rule 23(c)(2), Fed. R. Civ. P.; see Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 172-77 (1974). The Court concludes that class members have received more than adequate notice and have had sufficient opportunity to be heard on the fairness of the proposed Consent Decree. See Durrett v. Housing Authority of City of Providence, 896 F.2d at 604.

First, the timing and breadth of notice of the class settlement was sufficient under Rule 23. Notice was mailed to all known class members by January 15, 1999, nearly six weeks before the fairness hearing and a month before the deadline for comments, providing class members with ample time to submit their objections. See Maywalt v. Parker and Parsley Petroleum Co., 67 F.3d at 1079; Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1374-75 (9th Cir. 1993), cert denied sub nom, Reilly v. Tucson Elec. Power Co., 512 U.S. 1220 (1994).[15] The parties also exerted extraordinary efforts to reach class members through a massive

---

[15] One objector maintains that notice was insufficient because the facilitator did not advertise in the United States Virgin Islands. With the exception of that one objection, no one appears to believe that the scope of the notice provided was insufficient.

40

advertising campaign in general circulation and African American targeted publications and radio and television stations. See pages 15-16 above.

Second, the content of the notice was sufficient because it "fairly apprise[d] the . . . members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." See Maywalt v. Parker and Parsley Petroleum Co., 67 F.3d at 1079 (internal quotations omitted). The notice provided class members with information on the class, the purpose and timing of the fairness hearing, opt-out procedures and deadlines, and the deadline and process for filing claims packages. In addition, it provided telephone numbers for the facilitator and for class counsel to the extent that anyone had any questions.

Third, the Court gave objectors ample opportunity to present their objections to the Consent Decree. As noted above, the Court considered all of the written objections that were filed and provided objectors with an opportunity to present their objections orally at the fairness hearing. While the Court denied a request for an evidentiary hearing made by one group of objectors, see Order of March 11, 1999, the Court is not obligated to hold an evidentiary hearing, especially in view of the fact that it accepted and considered affidavits in place of testimony. See Jones v. Nuclear Pharmacy, Inc., 741 F.2d 322, 325 (10th Cir. 1984); Weinberger v. Kendrick, 698 F.2d 61, 79 (2nd Cir. 1982), cert. denied sub nom, Coyne v. Weinberger, 464 U.S. 818 (1983); cf. United States v. Cannons Engineering Corp, 899 F.2d 79, 93-94 (1st Cir. 1990).

Finally, because the Court has received a number of objections, it is clear that class members do not unanimously support the settlement. It is significant, however, that there are relatively few objections to the settlement in comparison with the size of the class. See

41

Thomas v. Albright, 139 F.3d at 232. This is a large class. As of March 26, 1999, 16,559 farmers had requested claims packages from the facilitator, and the facilitator already has received 1686 completed claim packages. By contrast, only 85 farmer class members have elected to opt out of the class. See Pls' Response to Post-Hearing Submissions of Objections at 6-7. Given the low rate of opt-outs and the relatively small percentage of class members objecting to the Consent Decree, the Court concludes that those objections do not warrant rejecting the Consent Decree. See Thomas v. Albright, 139 F.3d at 232 (settlement can be fair even if "a significant portion of the class and some of the named plaintiffs object to it").[16]

### B. Substantive Fairness: Likely Recovery at Trial Compared with Terms of Proposed Settlement

As our court of appeals has said, in considering a proposed class action settlement, the Court first must compare the likely recovery that plaintiffs would have realized if they had gone to trial with the terms of the settlement. See Thomas v. Albright, 139 F.3d at 231. The Court must look at the settlement as a whole and should not reject a settlement merely because individual class members claim that they would have received more at trial. The Court should scrutinize the terms of the settlement carefully, but the discretion of the Court to reject a settlement is restrained by the "principle of preference" that encourages settlements. See Durrett v. Housing Authority of City of Providence, 896 F.2d at 604; Stewart v. Rubin, 948 F.Supp. at

---

[16] Certain of the original named plaintiffs, including both Mr. Timothy Pigford and Mr. Cecil Brewington, have objected to the terms of the settlement. The Court has carefully considered their objections but nonetheless concludes that the settlement is fair, adequate and reasonable. See Thomas v. Albright, 139 F.3d at 232 (fact that named class representatives object to proposed settlement does not preclude court from finding that settlement is fair).

1086. The Court has received approximately sixty written submissions from forty-three groups or individuals objecting to or commenting on the fairness of the settlement. The Court also heard from numerous individuals and organizations at the fairness hearing on March 2, 1999.[17] Some of the objectors have argued persuasively that the settlement could have included broader relief, but that is not the test. See Stewart v. Rubin, 948 F.Supp. at 1087 ("the Court [should not] make the proponents of the agreement justify each term of settlement against a hypothetical measure of what concessions might have been gained"). The question is whether the structure of the settlement and the substantive relief including the amount of money provided are fair and reasonable when compared to the recovery that plaintiffs likely would have realized if the case went to trial. The Court concludes that they are.

The settlement provides a measure of certainty for most class members. The vast majority of class members probably will be entitled almost automatically to recovery under Track A, while Track B, which has no cap on the amount of damages available, provides those with stronger cases with the opportunity to realize greater recoveries. It is clear from the structure and terms of the settlement that class counsel were trying to strike a delicate balance between ensuring that as many class members as possible would receive compensation and ensuring that any compensation was adequate for the harm suffered. In striking this balance, class counsel were forced to recognize that most of the members of the class had little in the way of

---

[17] With one exception, see Order of March 11, 1999, the Court has considered all objections and comments that it received by April 2, 1999. Some of those who have submitted objections do not appear to be members of the class and therefore lack standing to challenge the fairness of the Consent Decree, see Mayfield v. Barr, 985 F.2d 1090 (D.C. Cir. 1993), but the Court has considered their objections anyway.

43

documentation or proof of their claims and likely would have recovered nothing if they were required to prove their cases by the traditional preponderance of the evidence standard. Track A was devised to provide a set amount of compensation for those class members who could meet only a minimal burden of proof, while Track B was not so limited. The Track A/Track B mechanism also ensures that this compensation is distributed as promptly as possible.

The Court is sympathetic to the reasons that various class members would have wanted class counsel to strike the balance differently in their negotiations. Nonetheless, the Court is not persuaded that striking a different balance would have been either achievable in the negotiating process or more favorable to all or even most members of the class. It certainly is not convinced that a better result would have been achieved by taking this case to trial where a substantial number of class members would have been unable to prove their claims by a preponderance of the evidence and thus would have recovered nothing. While each class member understandably wants the settlement to provide the greatest possible compensation to himself, the Court cannot conclude that the final balance struck by class counsel is anything but fair.

### 1. Likely Recovery If Case Had Proceeded to Trial

If the case had proceeded to trial, plaintiffs would have had in their possession strong evidence that the USDA discriminated against African American farmers. The reports of the Inspector General and the Civil Rights Action Team provide a persuasive indictment of the civil rights record of the USDA and the pervasive discrimination against African American farmers. There does not appear to be much dispute that racial discrimination has occurred

44

throughout the USDA and that the USDA and the county committees discriminated against African American farmers for decades in evaluating their applications for farm credit and benefits. In addition, when Congress took the unprecedented action of tolling the statute of limitations for ECOA, one of plaintiffs' major obstacles to establishing defendant's liability to the class was removed.

The problem is that even with that evidence, 80 to 90 percent of the class members lack any documentary evidence of the alleged discriminatory denial of credit or benefits to them. See Pls' Response to Written Objections at 11; Transcript of Hearing of March 2, 1999 at 180 (Mr. Alexander Pires) ("What would happen . . . in this case if we went to trial? 90 percent of our clients do not have files. . . . 90 percent do not have files"). In order to recover damages under ECOA at a trial, a class member would have to be able to establish by a preponderance of the evidence a discriminatory denial of loans or terms of credit, the extent of the injury to him caused by the denial and the amount of damages he suffered. Absent any documentation, this would have been an impossible burden for the majority of class members. In addition, many class members lack any documentation to prove that they ever filed a complaint of discrimination with the USDA and therefore would have encountered great difficulty in even establishing their membership in the class. With no documentary evidence that they fall within the parameters of the class, it is not at all clear that those plaintiffs would have been able to recover anything.

Some objectors have suggested that the issue of damages could have been resolved by trying the claims of representative members of the class. See Transcript of Hearing of March 2, 1999 at 46. As Mr. Alexander Pires explained, however, "I would never take the

45

thousands of clients we have now and say bet your claim on those 12 or 13 cases that are your lead cases. Even though we helped pick them. I know what's in those 12 cases, and that's risky." Id. at 180. In fact, class counsel discovered during the process of negotiating the settlement that mediating the cases individually was risky. When the parties were in the initial stages of settlement negotiations, they agreed to mediate twelve individual test cases: six chosen by the government and six chosen by plaintiffs. The lack of documentation presented serious obstacles to the resolution of those cases. The parties worked for an entire month trying to settle eight of those twelve cases, and at the end of that month, not one case had been resolved. See Transcript of Hearing of March 5, 1998 at 32.

Moreover, bringing this case to trial likely would have been a very complex, long and costly proposition. Practically speaking, prevailing class members likely would not have obtained relief for many years. Trial on the issue of liability was scheduled to last the month of February 1999. Trial probably would have involved a number of experts, and the government probably would have raised a number of legal issues for the Court to resolve. Even if the Court devoted all of its resources and time to deciding the issue of liability, it is unlikely that a decision would have been issued before the summer of 1999. If the Court had found the USDA liable, it then would have had to resolve the issue of remedy for each farmer. A mechanism for establishing class or subclass membership and for resolving issues of individual damages for each farmer in the class or subclass would have been necessary. If the remedy phase were tried on an individual basis for each farmer -- as the government might have urged again as it has in the past, because of the acknowledged lack of documentation in so many cases -- the remedial process would have dragged on for years. If the remedy phase were not tried on an

46

individual basis for each farmer, it is not inconceivable that a mechanism much like that negotiated in this settlement ultimately would be utilized. Even barring the inevitable appeal that the government would have taken in the event that plaintiffs prevailed, it is unlikely that any class member would have received any recovery for his injury for many years.

By contrast, the settlement negotiated by the parties provides for relatively prompt recovery. The claim of a claimant who chooses Track A will be resolved within 110 days of the date that the claim is filed. For those who choose Track B, the wait is a little longer because of discovery and trial, but the total time required is at most 240 days from the date that the claim is filed. Because neither side may appeal, the claimant will receive his compensation long before he would have if the case had gone to trial.

### 2. Overall Structure of Settlement: Track A and Track B

As currently structured, class members have three options: they have 120 days after the entry of the Consent Decree within which to notify the facilitator if they want to opt out of the class altogether, they may remain in the class and choose Track A or they may remain in the class and choose Track B.[18] Those who do not opt out have 180 days from the entry of the decree within which to file their claim packages and, for those who choose Track A, to submit their proof. Consent Decree at ¶¶ 5(c), 5(d).

A number of class members complain that they lack sufficient information to select among these three options and that the settlement is structured to force class members to choose Track A. At meetings throughout the country, class counsel currently is making every

---

[18] For those class members who allege only discrimination in a benefit transaction, Track B is not an option.

effort to reach all class members, to explain the options and to sit down with individual class members to provide advice. See Pls' Response to Post-Hearing Submissions, Exh. C. The turnout for these meetings has been overwhelming and has far exceeded everyone's expectations: literally hundreds of farmers show up for each meeting. It has become clear that there are more class members than anyone had anticipated and some class members contend that although they show up at the meetings, class counsel does not have time to meet with them. Class counsel is in the midst of scheduling more meetings and providing more time for each meeting, and they have assured the Court that they will be able to meet with all class members prior to the deadline for filing claim packages.

Those who assert only discrimination in non-credit, benefit transactions, rather than discrimination in credit transactions, do not have the option of proceeding under Track B, see Consent Decree at ¶ 5(d), and one objector complains that those who have faced discrimination in the USDA's benefit programs ought to be allowed to proceed under Track B. The problem is that programs that do not involve credit transactions are not subject to ECOA. The cause of action for those who allege discrimination in benefit programs arises solely under the Administrative Procedure Act, 5 U.S.C. § 706, which does not provide for the same measure of damages as is provided under ECOA. For that reason, those who allege only that they have suffered discrimination in a benefit program are afforded a slightly different form of relief than the relief provided for those who suffered discrimination in a credit transaction with the USDA. In other words, the different statutory predicates for the two different kinds of claims restricted the solutions that counsel could negotiate in each context.

48

A class member who selects Track A must submit "substantial evidence" demonstrating that he was a victim of race discrimination in a credit or benefit transaction with the USDA. Consent Decree at ¶¶ 9(a), 9(b). Some have objected that the "substantial evidence" standard is too high a burden of proof. Part of that concern stems from a misunderstanding of the "substantial evidence" standard. While the phrase "substantial evidence" makes it sound as though the burden of proof is high, the substantial evidence standard actually is one of the lowest possible burdens of proof known to the law. A "substantial evidence standard" is significantly easier for the claimant to meet than a "preponderance of the evidence" standard. A "preponderance of the evidence" standard means that the claimant has to show that it is more likely than not that discrimination happened, while under a "substantial evidence" standard, the claimant only has to provide a reasonable basis for the adjudicator to find that discrimination happened. See Consent Decree at ¶ 1(l); see also page 28 above. The substantial evidence standard therefore should not be a bar to the claims of most class members.

In order for a claimant to prevail under Track A, he must present specified evidence, including evidence that he was treated less favorably than a "specifically identified, similarly situated" white farmer. See Consent Decree at ¶¶ 9(a)(i)(C), 9(b)(i)(B). Some objectors contend that it will be too difficult for some claimants to present evidence of a specific, similarly situated white farmer who received more favorable treatment, especially since there is no right to discovery under Track A. At this point, however, class counsel has amassed a significant amount of material regarding the treatment by the USDA of both African American farmers and white farmers, and claimants will be able to call upon that material in completing

49

their claim packages. Class counsel should be able to provide most claimants with the evidence they need.

Under Track B, after limited discovery the claimant has a one day mini-trial before an arbitrator, and the claimant has the burden of establishing by a preponderance of the evidence that the USDA discriminated against him in a credit transaction. There are a number of objections to the Track B mechanism. First, the original Consent Decree defined Track B arbitrators as Michael Lewis and "any other person or person who he assigns to decide Track B claims." Some objectors contended that the definition of arbitrator was too vague and that those who were thinking about choosing Track B would have no way of knowing who the arbitrator might be. As Mr. James Morrison put it, "If Mr. Lewis chooses to have distinguished jurists, lawyers, former judges, I think he has that right as the four corners of the document gives him the authority. But if he wishes to choose Mickey Mouse, he could choose Mickey Mouse." See Transcript of Hearing of March 2, 1999 at 75. The parties addressed this concern in the revised Consent Decree by defining arbitrators as either Michel Lewis or "other person or persons selected by Mr. Lewis who meet qualifications agreed upon by the parties and by Mr. Lewis and whom Mr. Lewis assigns to decide Track B claims. . . ." See Consent Decree at ¶ 1(b). The parties have specified that Mr. Lewis will "develop a single list of alternates which the parties would pre-approve and from which Mr. Lewis can select an arbitrator for any arbitration that he is unable to handle himself." See Letter of March 19, 1999 from Parties at ¶ 1. While a claimant may not know the identity of the arbitrator at the time that the claimant chooses Track B, he will know who the potential candidates are and that they were not unilaterally selected by Mr. Lewis. In addition, class counsel can provide background information about the people on the list so the

50

claimant will be able to make a more informed decision about whether he wants to select Track B.

Track B provides for limited discovery prior to the one day mini-trial. Discovery is limited essentially to an exchange of lists of witnesses and exhibits and depositions of the opposing side's witnesses. See Consent Decree at ¶ 10(b)-(d). Some contend that discovery should be much broader. While it undoubtedly is true that the Track B mechanism anticipates less discovery than is ordinarily provided in the course of civil litigation, the Track B mechanism also resolves the claim much more quickly than an ordinary civil case would be resolved, in large part because of the shortened discovery period. Expanding the scope of discovery would take significantly more time, and class counsel in their judgment reasonably weighed the possible benefits of additional discovery against the delays that would ensue and determined that this was an adequate amount of discovery.[19]

A hearing on a Track B claim lasts eight hours. Consent Decree at ¶ 10(f). There is no live direct testimony. All direct testimony is submitted in writing. The eight hours at the hearing are comprised entirely of cross-examinations: each side is allotted four hours to cross-examine any witness of the opposing side. Several objectors contend that the claimant should be able to present live direct testimony, rather than presenting it only in written form. As with the Track B discovery issue, class counsel clearly was trying to balance the need for expedition with

---

[19] In fact, several objectors contend that the Track B mechanism, even with the shortened discovery period, takes too long to resolve claims. It is clear from the tensions between these two sets of objections that class counsel had to strike a delicate balance between resolving Track B claims expeditiously and obtaining the necessary discovery, and the balance finally struck appears eminently reasonable to the Court.

51

the need to ensure that the process produces just results. Again, the Court cannot conclude that the balance that counsel ultimately struck renders the terms of the settlement unfair.[20]

In order to prevail on his claims, a Track B claimant must prove by a preponderance of the evidence that "he was the victim of racial discrimination and that he suffered damages therefrom." See Consent Decree at ¶ 10(g). One objection maintains that this standard is too high and that claimants will be unable to meet this standard. To the extent that a claimant is concerned that he lacks sufficient evidence to meet the preponderance of the evidence standard, the traditional standard in civil litigation in all states and federal courts in this country, Track A provides a safer option. A claimant who cannot meet the preponderance of the evidence standard is not barred from all relief; instead, he is required to choose Track A rather than choosing Track B. Another objector also contends that a Track B claimant should not be required to establish economic damage in order to prevail on a Track B claim, and that the claimant should be able to prevail even if he can only establish emotional injury. As class counsel has pointed out, however, the economic damage requirement stems from ECOA, which provides the cause of action for all Track B claimants.

Some objectors complain about the Track A/Track B structure because those claimants who select Track B and fail to demonstrate by a preponderance of the evidence that they were the victims of race discrimination and that they suffered economic harm as a result will recover nothing under the settlement, see Consent Decree at ¶ 10(h), rather than being permitted

---

[20] The Court also notes that it is not unprecedented to conduct hearings in this way, even in trials in federal court. See Transcript at 51; Charles R. Richey, "Rule 16 Revised and Related Rules: Analysis of Recent Developments for the Benefit of Bench and Bar," 157 F.R.D. 69, 83-84 (1994).

52

to proceed under Track A if they lose under Track B. The decision whether to proceed under Track A or under Track B therefore takes on a great deal of significance. If a claimant who has sufficient evidence to meet Track A requirements but insufficient evidence to prevail in Track B nonetheless chooses Track B, he will receive nothing.

As class counsel and counsel for the government have pointed out, however, there simply is no way that those who fail on a Track B claim could be permitted to proceed under Track A without entirely undermining the settlement. The settlement is designed to resolve the claims of all class members as promptly as possible. Because of the absence of documentary proof in most cases, the vast majority of claimants will select Track A, and Track A is designed to be a mechanistic way to deal with claims very quickly. Track B, by contrast, involves a much lengthier, fact-specific inquiry, but it is anticipated that very few class members will opt for Track B. If there were a fallback mechanism to provide relief for claimants who failed in their Track B claims, every class member would choose Track B and the settlement structure would collapse under its own weight. See Letter of March 19, 1999 from the Parties to the Court at 4 (if a class member whose claim was denied under Track B nonetheless were permitted to recover under Track A, "virtually every class member who elects to seek relief under the Decree would choose to proceed under Track B. Not only would such a change increase exponentially the cost to the parties of implementing the Decree, it also would make it impossible for the parties or the arbitrator to come close to adhering to the deadlines for disposition of Track B claims imposed by ¶ 10(a)-(e). Thus this change would make the Decree unworkable").

Finally, the decisions of the adjudicators on Track A claims and the decisions of the arbitrators on Track B claims are final; there is no right to appeal those decisions, except that

53

the Monitor shall direct the arbitrator or adjudicator to reexamine the claim if he determines that a "clear and manifest error has occurred" that is "likely to result in a fundamental miscarriage of justice." Consent Decree at ¶¶ 9(a)(v), 9(b)(v), 10(i), 12(b)(iii). Many objectors contend that the absence of appeal rights renders the settlement structure unfair and/or that it gives the arbitrators and adjudicators too much power. As Mr. Willie Head expressed it, "[w]ould you send your sons and daughters off to war with one bullet." Transcript of Hearing of March 2, 1999 at 165. While the objection has force, class counsel made a strategic decision not to press for appeal rights because the government would have insisted that any appeal rights be a two-way street. See Transcript of Hearing of March 2, 1999 at 179. Any appeal process inevitably would delay payments to those claimants who prevailed on their claims. Since it is anticipated that most class members will prevail under the structure of the settlement, the Court concludes that the forfeit of appeal rights was a reasonable compromise.

### 3. Track A Relief: The $50,000 Objection

Any claimant who prevails on a Track A claim for discrimination in a credit transaction will receive: (1) a cash payment of $50,000; (2) forgiveness of all debt owed to the USDA incurred under or affected by the program that formed the basis of the claim; (3) a tax payment directly to the IRS in the amount of 25% of the total of the debt forgiveness and cash payment; (4) immediate termination of any foreclosure action that USDA initiated in connection with the loan(s) at issue in the claim; and (5) injunctive relief including one-time priority loan consideration and technical assistance. This relief package is the source of two objections.

54

Many objectors claim that a $50,000 cash award is insufficient to compensate them for the losses they sustained as a result of the USDA's discrimination. As Mr. Willie Head expressed it, "imagine that your home has been taken, your land has been taken, your automobile has been taken, and then you can make a decision and see if $50,000 will be enough for you." Transcript of Hearing of March 2, 1999 at 165-66. Putting a monetary value on the damage done to someone who has experienced discrimination at the hands of the government obviously is no easy matter, and it is probable that no amount of money can fully compensate class members for past acts of discrimination. It is quite clear, as the objectors point out, that $50,000 is not full compensation in most cases.

To the extent that a specific value can be put on such compensation, however, class counsel have thoroughly researched the issue and provided persuasive evidence that the amount is fair.[21] As class counsel points out, every claimant who prevails under Track A will receive not $50,000 but at least $62,500 (the sum of a $50,000 cash payment plus $12,500 in tax relief). And most who prevail under Track A will receive much more than that. The government

---

[21] To the extent that objectors are claiming that class counsel had no economic basis for agreeing to settle the case for the amount they did, that argument is belied by the fact that class counsel consulted a number of economists. See Pls' Response to Post-Hearing Submissions. Moreover, while one objector submitted affidavits from other economists that contend that the value of class members' claims may have been worth more than $50,000, those economists do not take into account the breadth of relief provided by the settlement. See id., Exh. A (Declaration of Dr. Mervin J. Yetley).

Class counsel also conducted an extensive study of the settlement of four previous civil rights actions in which plaintiffs alleged egregious violations of civil rights, including the case brought by Japanese Americans interned during World War II and the Tuskegee case involving the claims of African Americans injected with syphilis as part of government experiments. See Pls' Response to Post-Hearing Submissions at 2, n.2. Class counsel reasonably concluded that this settlement, which affords class members greater monetary relief than that afforded to individuals in those four cases, was fair and adequate.

estimates that the average African American farmer carries government debt of approximately $100,000, and those debts will be forgiven under Track A; in addition, the settlement provides for a tax payment of 25% of the debt forgiveness. See Pls' Response to Post-Hearing Submissions, Exh. A (Declaration of Dr. Mervin J. Yetley) at ¶ 5(c)-(d). The average cash value of relief for a claimant who prevails under Track A therefore totals $187,500. Id. at ¶ 6. Class members undoubtedly would have liked to have received a larger settlement. But $187,500 is a significant amount of money, especially in view of the fact that a claimant who lacks the detailed records required in a normal civil action to prove his case by a preponderance of the evidence need only establish his claim by substantial evidence in order to receive that compensation. The Court therefore concludes that class counsel had an adequate basis for agreeing to this amount and that it is fair and reasonable.

Some objectors also contend that the tax relief provided under Track A is insufficient because it may not cover all the federal taxes owed on the settlement and because it does not cover state taxes. Any effort to determine the exact amount of federal tax owed on a settlement, however, would have required scores of auditors and inevitably would have resulted in delays. The logistical problems presented by a provision covering state taxes would have been even more complicated, since every state has a different method of assessing income taxes and different tax rates. Again, class counsel in its judgment determined that a flat tax payment was in the best interests of the class and in assuring a prompt resolution of the claims, and the Court is unwilling to second-guess that judgment.

56

#### 4. Other Objections to Individual Relief

The failure of both Track A and Track B to include certain measures of individual relief also has led to objections. First, some contend that the USDA should provide relief from loans owed to creditors other than the USDA. They argue that because the USDA discriminated in its credit programs, many African American farmers either had to obtain loans from private banks at very high interest rates or had to buy their equipment and supplies on credit from private companies at high interest rates. They therefore seek to have all of those loans forgiven or at least to have loans that were guaranteed by the USDA forgiven. Class counsel clearly tried to negotiate for as much debt forgiveness as possible. But as Mr. J.L. Chestnut put it, "There is no likelihood the United States government is going to go around to . . . commercial banks paying off private loans of black farmers, whether it relates to discrimination or not. Nobody is going to be able to negotiate that with the United States government. How do I know that? Because I tried." Transcript of Hearing of March 2, 1999 at 168.

Second, some have objected that the Consent Decree does not contain a provision to protect a class member's settlement award from his bankruptcy estate. The parties to this action cannot, however, determine whether the bankruptcy estate has a right to a claimant's settlement award. Those matters are controlled by operation of the bankruptcy laws and will turn on issues such as whether the claim is considered the property of the estate. See 11 U.S.C. § 541. Those matters properly are resolved in bankruptcy court between the parties to those actions and cannot be resolved by the parties to this action.

Third, a claimant who prevails under Track B is entitled to "any USDA inventory property that was formerly owned by the class member but which was foreclosed in connection

57

with the ECOA claim(s) resolved in the class member's favor by the arbitrator." <u>See</u> Consent Decree at ¶ 10(g)(iv). With that one exception, however, the Consent Decree has no provision for returning land to prevailing claimants. A number of objectors have stated the need for more extensive land return provisions. Again, this was a matter that class counsel clearly tried to negotiate, and they obtained the best possible resolution they could.

Finally, one objector expressed concern that the credit records of many claimants have been damaged by the discrimination they experienced at the hands of the USDA and that it therefore will be difficult for those farmers to obtain credit from the USDA or others in the future. In response to that objection, the parties agreed to revise the Consent Decree to include a provision stating that "outstanding debt discharged pursuant to [Track A or Track B] shall not adversely affect the claimant's eligibility for future participation in any USDA loan or loan servicing program." <u>See</u> Consent Decree at ¶ 11(c). In sum, while some class members clearly would have liked the terms of the settlement to be slightly different, the terms of the settlement are fair when compared with the likely recovery plaintiffs would have obtained at trial.

### C. Monitoring and Enforcement Provisions

Some objectors contend that at the very least the enforcement and monitoring provisions of the Consent Decree must be strengthened. The Consent Decree provides for the appointment of a Monitor for a period of five years to track and report on the USDA's compliance with the terms of the Consent Decree. Under the original proposed Consent Decree, the Monitor was appointed by the Secretary of Agriculture, subject to class counsels' approval. A number of objections noted that the USDA did not have any incentive to appoint a strong and

independent Monitor, and that the Monitor provision therefore needed to be changed. In response to those concerns, the parties revised the Monitor provision so that the Court now appoints the Monitor from a list of names submitted by the parties. See Consent Decree at ¶ 12(a). The Monitor is removable only for "good cause."

A number of objections also noted that the original proposed Consent Decree appeared to prevent the Court from exercising jurisdiction in the event that the USDA did not comply with the terms of the decree. The law is clear that the Court retains jurisdiction to enforce the terms of the Consent Decree. See Spallone v. United States, 493 U.S. 265, 276 (1989); Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 286 (D.C. Cir. 1993) (principle is well-established that trial court "retains jurisdiction to enforce consent decrees and settlement agreements"); Twelve John Does v. District of Columbia, 855 F.2d 874, 876 (D.C. Cir. 1988) (in action to enforce terms of consent decree, district court "unquestionably had power to hold the District of Columbia in civil contempt for violations of the consent decree"). The parties also have clarified that the Court retains jurisdiction to enforce the terms of the Decree.

### D. Absence of Provisions Preventing Future Discrimination

The stated purpose of the Consent Decree is to "ensur[e] that in their dealings with the USDA, all class members receive full and fair treatment that is the same as the treatment accorded to similarly situated white persons." Consent Decree at 2. The Consent Decree does not, however, provide any forward-looking injunctive relief. It does not require the USDA to take any steps to ensure that county commissioners who have discriminated against class members in the past are no longer in the position of approving loans. Nor does it provide a

mechanism to ensure that future discrimination complaints are timely investigated and resolved so that the USDA does not practice the same discrimination against African American farmers that led to the filing of this lawsuit. In fact, the Consent Decree stands absolutely mute on two critical points: the full implementation of the recommendations of the Civil Rights Action Team and the integration and reform of the county committee system to make it more accountable and representative. The absence of any such provisions has led to strong, heart-felt objections. It also has caused the Court concern. After comparing the terms of the settlement as a whole with the recovery that plaintiffs likely would have received after trial, however, the Court cannot conclude that the absence of any such prospective injunctive relief renders the settlement as a whole unfair.

There are several legal responses to the objections about the lack of forward-looking injunctive relief. First, while plaintiffs sought both declaratory and monetary relief in the complaint, they never sought an injunction requiring the USDA to restructure or to fire people who may have engaged in discrimination. See Complaint at 40-42; Seventh Amended Complaint at 60-63. All of the objectors who seek to have the USDA restructured therefore are going beyond the scope of the complaint in this case. The role of the Court in approving or disapproving a settlement is limited to determining whether the settlement of the case before it is fair, adequate and reasonable. The Court cannot reject the Consent Decree merely because it does not provide relief for some other hypothetical case that plaintiffs could have but did not bring. Cf. United States v. Microsoft, 56 F.3d at 1459-60 (court cannot "reformulate the issues" or "redraft the complaint").

60

Second, nothing in the Consent Decree authorizes the USDA to engage in illegal conduct in the future, and the Consent Decree therefore should not be rejected for its failure to include such prospective injunctive relief. See Isby v. Bayh, 75 F.3d at 1197 ("we cannot approve a class action settlement which either initiates or authorizes the continuation of clearly illegal conduct . . . [but] we are mindful that . . . any illegality or unconstitutionality must appear as a legal certainty on the face of the agreement before a settlement can be rejected on this basis") (internal citations and quotations omitted).

Third, even if plaintiffs had prevailed on their ECOA claims at trial, it is not at all clear that the Court could have or would have granted the broad injunctive relief that the objectors now seek. The injunctive relief that the objectors seek, essentially an injunction requiring the USDA to change the way it processes credit applications, may be authorized where plaintiffs prove a constitutional violation, see Hills v. Gautreaux, 425 U.S. 284, 297 (1976), but plaintiffs in their Seventh Amended Complaint do not allege a constitutional violation and they have not undertaken to prove one. Moreover, while ECOA authorizes the Court to "grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter," 15 U.S.C. § 1691e(c), in employing its broad equitable powers the Court must exercise "the least possible power adequate to the end proposed." See LaShawn A. v. Barry, 144 F.3d 847, 854 (D.C. Cir. 1998) (quoting Spallone v. United States, 493 U.S. 265, 280 (1990)).

Those legal responses, however, provide little comfort to those who have experienced discrimination at the hands of the USDA and who legitimately fear that they will continue to face such discrimination in the future. The objections arise from a deep and overwhelming sense that the USDA and all of the structures it has put in place have been and

61

continue to be fundamentally hostile to the African American farmer. As Mr. Leonard Cooper put it, "You cannot mediate . . . institutionalized racism." Transcript of Motions Hearing of March 2, 1999 at 142. Another class member expressed it more personally: "They have humiliated me and my family since [1989]. . . . And I was just wondering if there couldn't be something put in the provisions that would stop these FSA agents from humiliating and degrading [us] as they do. . . . my wife has almost had a nervous breakdown by dealing with our agent and he continues to do the same things that he has done in the past and I just wish there was some way for you to put something in that provision that would stop some of that stuff." Id. at 146.

Most fundamentally, these objections result from a well-founded and deep-seated mistrust of the USDA. A mistrust borne of a long history of racial discrimination. A mistrust that is well-deserved. As Mr. Chestnut put it, these objections reflect "fear which reaches all the way back to slavery. . . . That objection, you heard it from many today, it really asks you to retain jurisdiction over this case in perpetuity. Otherwise they say USDA will default, ignore the lawful mandates of this Court, and in time march home scot-free while blacks are left holding the empty bag again." Transcript of Hearing of March 2, 1999 at 172. The Court cannot guarantee class members that they will never experience discrimination at the hands of the USDA again, and the Consent Decree does not purport to make such a guarantee. But the Consent Decree and the Court do provide certain assurances.

First, under the terms of this Consent Decree, the USDA is obligated to pay billions of dollars to African American farmers who have suffered discrimination. Those billions

of dollars will serve as a reminder to the Department of Agriculture that its actions were unacceptable and should serve to deter it from engaging in the same conduct in the future.

Second, the USDA is not above the law. Like many of the objectors, the Court was surprised and disappointed by the government's response to the Court's modest proposal that the Consent Decree include a simple sentence that in the future the USDA shall exert "best efforts to ensure compliance with all applicable statutes and regulations prohibiting discrimination." Letter from the Court to Counsel, dated March 5, 1999; see Response Letter from the Parties to the Court, dated March 19, 1999. Whether or not the government explicitly states it in this Consent Decree, however, the Constitution and laws of the United States continue to forbid discrimination on the basis of race, see, eg., U.S. CONST. amend. V; 15 U.S.C. § 1691; 42 U.S.C. § 2000d, as do the regulations of the USDA. See 7 C.F.R. §§ 15.1, 15.51. The actions of the USDA from now into the future will be scrutinized closely -- by class members, by their now organized and vocal allies, by Congress and by the Court. If the USDA or members of the county committees are operating on the misapprehension that they ever again can repeat the events that led to this lawsuit, those forces will disabuse them of any such notion.

Most importantly, the farmers who have been a part of this lawsuit have demonstrated their power to bring about fundamental change to the Department of Agriculture, albeit more slowly than some would have wanted. Each individual farmer may feel powerless, but as a group they have planted seeds that are changing the landscape of the USDA. As a group, they spurred Secretary Glickman in 1996 to look inward at the practices of the USDA and to examine African American farmers' allegations that the discrimination of the USDA was leading them to the point of financial ruin. As a group, they led Secretary Glickman to create the

63

Civil Rights Action Team, a team that recommended sweeping changes to the USDA and to the county committee system. Indeed, in February 1997, the USDA Civil Rights Action Team itself recommended that the county committee system be revised by converting all county non-federal positions, including the county executive directors, to federal status, that the committee selection process by changed, that voting members of underrepresented groups be appointed to state and county committees, and that county committees be removed from any farm loan determinations. CRAT Report at 64-65.

As a group, the farmers mobilized a broad coalition within Congress to take the unprecedented action of tolling the statute of limitations. As a group, they brought Secretary Glickman to the negotiating table in this case and achieved the largest civil rights settlement in history. And as a group, they have made implementation of the recommendations of the CRAT Report a priority within the USDA. See Statement of February 9, 1999, by Secretary Dan Glickman, Before the Subcommittee on Agriculture, Rural Development, and Related Agencies Committee on Appropriations, United States Senate ("I also want to emphasize the importance that the President and I have placed on USDA civil rights issues; this priority is reflected in the [FY 2000] budget. The President's budget provides the necessary funding to continue to carry out the recommendations of the Civil Rights Action Team (CRAT) as well as the recommendations of the National Commission on Small Farms which supports our civil rights agenda"). While the USDA landscape has remained resistant to change for many seasons, the labors of these farmers finally are beginning to bear fruit. This settlement represents one significant harvest. It is up to the Secretary of Agriculture and other responsible officials at the

64

USDA to fulfill its promises, to ensure that this shameful period is never repeated and to bring the USDA into the twenty-first century.

## V. CONCLUSION

Forty acres and a mule. The government broke that promise to African American farmers. Over one hundred years later, the USDA broke its promise to Mr. James Beverly. It promised him a loan to build farrowing houses so that he could breed hogs. Because he was African American, he never received that loan. He lost his farm because of the loan that never was. Nothing can completely undo the discrimination of the past or restore lost land or lost opportunities to Mr. Beverly or to all of the other African American farmers whose representatives came before this Court. Historical discrimination cannot be undone.

But the Consent Decree represents a significant first step. A first step that has been a long time coming, but a first step of immeasurable value. As Mr. Chestnut put it, "Who really knows the true value, if there is one, for returning a small army of poor black farmers to the business of farming by the year 2000 who otherwise would never make it back? I am not wise enough to put a dollar value on that and I don't think anybody on this planet is wise enough to reduce that to dollars and cents." Transcript of Hearing of March 2, 1999 at

171. The Consent Decree is a fair, adequate and reasonable settlement of the claims brought in this case. It therefore will be approved and entered.

 SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4/14/99

66 .